RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0157p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────────

AVELINO CRUZ MARTINEZ,

        *Petitioner-Appellant,*

        No. 14-5860

*v.*

UNITED STATES OF AMERICA,

        *Respondent-Appellee.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:14-cv-00174—Aleta Arthur Trauger, District Judge.

Argued: March 9, 2016

Decided and Filed: July 7, 2016

Before: COLE, Chief Judge; BOGGS, BATCHELDER, MOORE, CLAY, GILMAN,
GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, GRIFFIN, KETHLEDGE,
WHITE, STRANCH, and DONALD, Circuit Judges.

─────────────────────

## COUNSEL

**ARGUED:** Michael C. Holley, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. David M. Lieberman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Michael C. Holley, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. David M. Lieberman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Lynne T. Ingram, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

    SUTTON, J., delivered the opinion of the court in which BOGGS, BATCHELDER, GIBBONS, ROGERS, COOK, McKEAGUE, GRIFFIN, KETHLEDGE, and STRANCH, JJ., joined. WHITE, J. (pp. 26–27), delivered a separate opinion concurring in the judgment in which MOORE and GILMAN, JJ., joined. CLAY, J. (pp. 28–51), delivered a separate dissenting opinion. DONALD, J. (pg. 52), delivered a separate dissenting opinion in which COLE, C.J., joined.

1

---

**OPINION**

---

SUTTON, Circuit Judge.   After people commit violent crimes, they sometimes flee, leaving the city of the crime in some instances, even leaving the country in others.  If a fugitive leaves the country, that complicates law enforcement efforts.  One trait of sovereignty is that countries have no legal, as opposed to moral, obligation to turn criminal suspects over to another country for prosecution.  The point of extradition treaties is to prevent such crimes from going unpunished by imposing a golden rule obligation on each party to the treaty—an agreement by each country to return haven-seeking fugitives to the other.

The golden rule is not the first thing that came to anyone's mind after two murders occurred at a New Year's Eve party gone awry in a small Mexican village in 2006.  Avelino Cruz Martinez, now a citizen of the United States, attended the party and admits that there is probable cause to believe he was the assailant.  After the murders, Cruz Martinez returned to his home in the United States.

Invoking a 1978 extradition treaty, Mexico asked its northern neighbor to return Cruz Martinez to Mexico to be tried for murder.  Cruz Martinez filed a habeas corpus petition, claiming that his extradition would violate Article 7 of the treaty, which prohibits extradition when "prosecution" or "enforcement of the penalty" for the charged offense "has become barred by lapse of time according to the laws of the requesting or requested Party."  Extradition Treaty, U.S.-Mex., art. 7, May 4, 1978, 31 U.S.T. 5059, 5064–65.  In particular, he argued that his extradition would violate (1) the relevant statute of limitations and (2) his Sixth Amendment right to a speedy trial.  The district court rejected his arguments and denied his petition for habeas corpus. So do we.

I.

Santa María Natividad, a village in the State of Oaxaca, Mexico, is home to about fifty families and two hundred residents.  One of those residents was Samuel Francisco Solano Cruz, who was to host a goat roast for municipal leaders and members of the town band on New Year's

Day 2006. In the waning hours of 2005, he went to a party outside the local municipal hall to deliver the invitations. But shortly after he arrived, a man approached him, screamed "son of a bitch!", and shot him six times. R. 2-13 at 14 (emphasis omitted). A bystander, Antolín Cruz Reyes, who tried to help Solano Cruz was shot as well. Both men died from the gunshot wounds, while the murderer got in his truck and fled the scene.

Solano Cruz's family accused Avelino Cruz Martinez, then a United States permanent resident (and a citizen since 2010) whose family lived in Santa María Natividad, of the murders. Within two weeks of the shooting, Solano Cruz's widow and parents met with Cruz Martinez's wife and brother before a town clerk. Although Cruz Martinez's wife maintains her husband's innocence, she, along with the four others present at the meeting, signed an agreement stating that Cruz Martinez had "committed the homicide." R. 2-17 at 12. It also provided that "the family of the perpetrator" would pay 50,000 pesos for "the expenses incurred" by Solano Cruz's relatives as a result of the "unfortunate incident." *Id.* "Once the parties accept this agreement and commit to enact its terms," the contract concluded, "the matter shall be closed." *Id.* at 13.

The matter did not close. A few days after Solano Cruz's family agreed to settle, two eyewitnesses made sworn statements before public officials, pointing to Cruz Martinez as the New Year's Eve murderer. An Oaxacan judge issued an arrest warrant charging Cruz Martinez with "murder with the aggravating circumstance of unfair advantage," R. 2-13 at 11 (emphasis omitted), which covers homicides that occur when the perpetrator "is superior in physical force" and the victim "is not armed," or when the perpetrator "is superior by the weapons [he] use[s]" as compared to the victim, *id.* at 52. The court issued the warrant on February 23, 2006, and notified the public prosecutor's office the next day.

That is how things stood for the next few years. Cruz Martinez, following the murders, returned to the United States, although he traveled back to Mexico a couple times. His family remained in Santa María Natividad for a time but eventually joined him in the United States— Lebanon, Tennessee, to be precise.

In 2009, an American consular official asked about the status of Cruz Martinez's arrest warrant, and the Oaxacan court responded that it was "still pending and executable." *Id.* at 59.

In May 2012, the Mexican government filed a diplomatic note with the United States Department of State, informing it of the charges against Cruz Martinez and requesting his "provisional arrest" (a procedure authorized by the extradition treaty between the two nations). R. 2-6 at 16 (emphasis omitted); *see* Extradition Treaty, U.S.-Mex., *supra*, art. 11, 31 U.S.T. at 5068. American authorities arrested him a little over a year later, and Mexican officials filed a formal extradition request in August 2013.

That filing triggered a set of diplomatic, judicial, and quasi-judicial procedures. Federal law authorizes the United States Secretary of State to designate federal and state judges or magistrate judges to conduct hearings whenever a foreign nation requests an individual's extradition under the terms of a treaty. 18 U.S.C. § 3184. If the judge "deems the evidence sufficient to sustain the charge," the statute provides, "he shall certify . . . to the Secretary of State" that the individual is extraditable. *Id.* The certification decision is not appealable, although the accused may challenge it through a petition for habeas corpus. *In re Mackin*, 668 F.2d 122, 125–30 (2d Cir. 1981); *see In re Metzger*, 46 U.S. 176, 191–92 (1847). Following certification, the Secretary of State decides, as a matter of discretion, whether to extradite the accused. 18 U.S.C. § 3186; *see Nezirovic v. Holt*, 779 F.3d 233, 237 (4th Cir. 2015).

Complying with these procedures, the Secretary of State filed Mexico's extradition request with a federal magistrate judge in Tennessee. Cruz Martinez raised multiple challenges to his provisional arrest and to the extradition proceedings. But the magistrate judge rejected all of them, certifying to the Secretary of State that Cruz Martinez could be extradited. Cruz Martinez filed a habeas corpus action contesting the magistrate judge's certification decision, *see* 28 U.S.C. § 2241(a), but the district court denied his petition. Cruz Martinez appealed.

II.

"Extradition shall not be granted," Article 7 of the United States-Mexico Extradition Treaty says, "when the prosecution or the enforcement of the penalty" for the charged offense "has become barred by lapse of time according to the laws of the requesting or requested Party." Extradition Treaty, U.S.-Mex., *supra*, art. 7, 31 U.S.T. at 5064–65. Cruz Martinez argues that his prosecution has become barred by (1) the relevant American statute of limitations and (2) the

Speedy Trial Clause of the Sixth Amendment to the United States Constitution.  We consider each argument in turn.

A.

Cruz Martinez argues that the charged offense is analogous to second-degree murder under American federal law, which means a five-year limitations period applies to the charge. 18 U.S.C. §§ 1111(a)–(b), 3282(a).  The government disagrees, comparing the offense to first-degree murder, which comes with no limitations period.  *Id.* §§ 1111(a)–(b), 3281, 3591(a)(2).  We need not take sides on this dispute because, for the reasons forcefully expressed in the panel majority's opinion, the statute of limitations did not expire even if the five-year period applies. *Cruz Martinez v. United States*, 793 F.3d 533, 542–44 (6th Cir. 2015).

"[N]o person shall be prosecuted, tried, or punished for any [non-capital] offense," the five-year limitations statute provides, "unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."  18 U.S.C. § 3282(a).  Because statutes of limitations protect defendants from excessive delay between the time of the offense and the time of prosecution, they stop running when the prosecution begins— which means, in American federal courts, when an indictment or information is returned. *United States v. Marion*, 404 U.S. 307, 320–23 (1971).  But Mexico, which models its legal system not on Blackstone's common law but on Napoleon's civil law, lacks the sort of indictment and information procedures that exist in the United States.  Miguel Sarré & Jan Perlin, "Mexico," in *Criminal Procedure: A Worldwide Study* 351, 372 (Craig M. Bradley ed., 2d ed. 2007).  Does that mean there is nothing Mexico can do under § 3282 to prevent a "lapse of time" from occurring?  No:  Because the issuance of an arrest warrant marks the end of the preliminary investigation and the beginning of the prosecution in Mexico, that event stops the American statute of limitations from running.  And because a Mexican court issued an arrest warrant within two months of Cruz Martinez's alleged offense, the five-year limitations period does not bar his prosecution.

The only other circuit to consider this question agrees.  It held that "a Mexican arrest warrant is the equivalent of a United States indictment and may toll the United States statute of

limitations" for purposes of an extradition treaty. *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009). The *Third Restatement of Foreign Relations Law* echoes the point. "For purposes of applying statutes of limitation to requests for extradition," it notes, courts generally calculate the limitations period "from the time of the alleged commission of the offense to the time of the warrant, arrest, indictment, or similar step in the requesting state, or of the filing of the request for extradition, whichever occurs first." *Restatement (Third) of the Foreign Relations Law of the United States* § 476 cmt. e (1987).

Cruz Martinez concedes that Mexico should be able to satisfy § 3282 even though it does not have an indictment or information procedure. Cruz Martinez Principal Br. 34. But the American clock keeps ticking, he argues, until Mexico does something (such as "designat[e]" Cruz Martinez "a fugitive from justice") that would stop the limitations period from running under *Mexican* law. R. 2-19 at 2. An arrest warrant, he says, does not do the trick. The extradition treaty, however, offers a defense to extradition when prosecution is barred "according to the laws of the requesting or requested Party," Extradition Treaty, U.S.-Mex., *supra*, art. 7, 31 U.S.T. at 5065—a formulation that does not require us to mix and match national laws by applying Mexican legal requirements to American limitations periods. That language is especially significant given that some extradition treaties *do* demand this sort of jumbling, requiring the requested State to "take[] into consideration insofar as possible" any "acts constituting an interruption or a suspension of the time-bar in the Requesting State." Extradition Treaty, U.S.-Belg., art. 2(6), Apr. 27, 1987, T.I.A.S. No. 97-901, at 2; *see also* Extradition Treaty, U.S.-Lux., art. 2(6), Oct. 1, 1996, T.I.A.S. No. 12,804, at 4. The American statute of limitations does not bar Cruz Martinez's prosecution.

B.

1.

Cruz Martinez separately argues that the treaty's "barred by lapse of time" provision picks up the Speedy Trial Clause of the Sixth Amendment to the United States Constitution, which says that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." At the outset, it is worth clarifying what he does, and does not, argue in this

respect.  He does not argue that the speedy-trial guarantee applies to an American (like Cruz Martinez) who is tried in a Mexican court for violating Mexican law.  When the Sixth Amendment says "all criminal prosecutions," it refers to all prosecutions in this country, not anywhere in the world.  *See United States v. Balsys*, 524 U.S. 666, 672–75 (1998).  And he does not argue that the guarantee applies to extradition proceedings, which are not "criminal prosecutions."  *See Martin v. Warden*, 993 F.2d 824, 829 (11th Cir. 1993).  He instead argues that the treaty's "barred by lapse of time" language incorporates the speedy-trial guarantee and prohibits extradition when a Mexican prosecution would violate that right.  As he sees it, a non-speedy trial is one that takes too long to start and to finish, which creates a lapse-of-time defect in the prosecution.  It is not that easy.  The text and context of the treaty provision, the illuminating history behind it, and all precedential authority and scholarly commentary establish that the phrase "barred by lapse of time" does not incorporate the American Constitution's speedy-trial guarantee.

*Text.*  Article 7, recall, prohibits extradition "when the prosecution or the enforcement of the penalty for the offense for which extradition has been sought has become barred by lapse of time according to the laws of the requesting or requested Party."  Extradition Treaty, U.S.-Mex., *supra*, art. 7, 31 U.S.T. at 5064–65.  Put less passively, *time* must do the barring.  Yet the Sixth Amendment does not create a fixed time bar on trial initiation—a time limit after which the trial must be called off.  As the Supreme Court has explained, the speedy-trial right is "*consistent* with delays" (and thus consistent with lapses of time) and "depends upon circumstances," as it is "impossible to determine with precision when the right has been denied" in our system of "swift but deliberate" justice.  *Barker v. Wingo*, 407 U.S. 514, 521–22 (1972) (emphasis added) (quotation omitted).  The right is a "relative," "amorphous," and "slippery" one.  *Id.* at 522 (quotation omitted).  Because the Sixth Amendment does not establish a time limit, fixed or otherwise, before a trial must start, it does not create a rule that "bar[s]" criminal prosecutions due to "lapse of time."

Not only does Cruz Martinez's argument require us to add something to the Sixth Amendment that does not exist (a time bar), it requires us to subtract requirements of the Sixth Amendment that do exist.  A criminal defendant cannot win a Sixth Amendment challenge by

pointing to a calendar and counting off the days. He instead must show that, by balancing the four factors the Supreme Court has instructed us to consider in speedy-trial cases, he should receive relief. *Id.* at 530–33. The "[l]ength of delay," it is true, is *one* of those factors—but only one. *Id.* at 530. Courts also must weigh "the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant" in determining whether a speedy-trial violation occurred. *Id.* Even if there has been considerable delay, for example, "a valid reason" for that delay, "such as a missing witness, should serve to justify" it. *Id.* at 531. If a defendant fails to object contemporaneously to the lapse of time, the Supreme Court has told us, that will also "make it difficult for [him] to prove that he was denied a speedy trial." *Id.* at 532. "[N]one of the four factors"—not even delay of a specified length—is "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." *Id.* at 533. The Court could not be clearer: Lapse of time, standing alone, does not—*cannot*—violate the Speedy Trial Clause in the absence of at least some of the other factors. We know of no case in which a lapse of time by itself created a speedy-trial violation—or, to put it in the words of the treaty, in which the prosecution was "barred by lapse of time."

Another textual clue points in the same direction. The treaty does not cover any and all "lapse[s] of time" that may occur in a criminal case. It applies only to time lapses with respect to "the prosecution or the enforcement of the penalty" for the charged offense. Extradition Treaty, U.S.-Mex., *supra*, art. 7, 31 U.S.T. at 5064–65. That language naturally applies to statutes-of-limitations periods that "bar[]" the commencement of a "prosecution" or "enforcement" proceeding. It also naturally applies to limitations periods that "bar[]" "penalt[ies]" already handed down from being "enforce[d]" to the extent any exist—limitations periods that, while generally unknown in the United States, are common in civil law countries like Mexico. *See Yapp v. Reno*, 26 F.3d 1562, 1568 (11th Cir. 1994). The same is not true for guarantees that apply *after* an indictment (or its equivalent) through the end of trial. Just as this treaty provision would not cover criminal procedure guarantees that apply to a trial already begun, it does not naturally apply to speedy-trial requirements that prohibit the criminal process, once started, from continuing. The speedy-trial right after all operates not by barring the initiation of a prosecution but by preventing it from continuing, *see Marion*, 404 U.S. at 320–23, and may not apply to the execution of sentences already pronounced, *cf. United States v. Melody*, 863 F.2d 499, 504–05

(7th Cir. 1988).  These rights, like trial guarantees, usually kick in outside the two periods in which extradition limits apply:  (1) the initiation of a prosecution and (2) the enforcement of a "judicially pronounced penalty of deprivation of liberty."  Extradition Treaty, U.S.-Mex., *supra*, art. 1(1), 31 U.S.T. at 5061.

Another linguistic clue supports this interpretation.  In this case, as in many cases involving treaty interpretation, we have not one official text but two—the English and Spanish versions of the treaty, each of which is "equally authentic."  *Id.*, 31 U.S.T. at 5075.  The English version of Article 7 bears the title "Lapse of Time," while the Spanish version says "Prescripción."  *Compare id.*, art. 7, 31 U.S.T. at 5064, *with id.*, art. 7, 31 U.S.T. at 5083.  And the phrase "barred by lapse of time" reads, in the Spanish version of the text, "haya prescrito," using a verb form related to the noun "prescripción."  *Compare id.*, art. 7, 31 U.S.T. at 5065, *with id.*, art. 7, 31 U.S.T. at 5083.  We must interpret the translated documents in tandem, because, "[i]f the English and the Spanish parts can, without violence, be made to agree, that construction which establishes this conformity ought to prevail."  *United States v. Percheman*, 32 U.S. (7 Pet.) 51, 88 (1833).  In unearthing the best translation of non-English terms, we may refer to foreign "cases," "dictionaries," "legislative provisions," "treaties and scholarly writing," and other "legal materials," as the Supreme Court has done when assessing the "legal meaning" of foreign words.  *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 536–40 (1991); *Air France v. Saks*, 470 U.S. 392, 399 (1985).

The English and Spanish texts of the 1978 extradition treaty "conform[]" quite easily, it turns out, because "prescripción" means "statute of limitations."  Bilingual legal dictionaries tell us as much, with one Spanish–English dictionary providing "[s]tatute of limitations" as the first definition of "prescripción."  Henry Saint Dahl, *Dahl's Law Dictionary* 385 (6th ed. 2015).  Mexican legal provisions tell us as much, because Article 88 of the Code of Criminal Procedure of Oaxaca—the state where Cruz Martinez's alleged crimes occurred—uses the phrase "[c]ómputo de la prescripción" to describe the "[c]alculation of the [s]tatute of [l]imitations."  R. 2-19 at 2, 7.  Previous treaties tell us as much, because the 1899 United States-Mexico extradition treaty translates the phrase "has become barred by limitation" (a phrase that, as Cruz Martinez concedes, refers only to statutes of limitations) as "la prescripción impida."  Treaty of

Extradition, U.S.-Mex., art. III(3), Feb. 22, 1899, 31 Stat. 1818, 1821. The Department of State tells us as much, because, in a 1959 letter to the Department of Justice, it used the phrases "prescription" and "statute of limitations" interchangeably. 6 Marjorie M. Whiteman, *Digest of International Law* § 17, at 864 (1968). And English legal dictionaries tell us as much, indicating that the word "prescription" means "[t]he effect of the *lapse of time* in creating and destroying rights" and that the phrase "liberative prescription" refers to "the civil-law equivalent of a statute of limitations." *Black's Law Dictionary* 1373 (10th ed. 2014) (emphasis added). When writing the words "lapse of time" in Spanish, the treaty's drafters thus chose language that reflected the phrase's status as a term of art within the law of extradition—a term of art interchangeable with the phrase "statute of limitations."

*Context.* Article 7's neighbors reinforce this conclusion. Article 10(2) of the treaty sets forth the extradition procedures that a requesting State must follow and requires every request to include "[t]he text of the legal provisions relating to the *time limit* on the prosecution or the execution of the punishment of the offense." Extradition Treaty, U.S.-Mex., *supra*, art. 10(2)(d), 31 U.S.T. at 5066 (emphasis added). This disclosure requirement provides an enforcement mechanism for Article 7, allowing the requested State to verify whether extradition is "barred by lapse of time" without embarking on a self-guided tour of another country's laws. Article 10(2) in other words interprets "lapse of time" to mean "time limit," confirming that the language covers only statutes of limitations. *See* Cruz Martinez Principal Br. 11 (equating "time limit" and "statute of limitations").

*History.* A few pages of history confirm the logic of this interpretation. Extradition treaties have been a part of American international relations since 1794, when Jay's Treaty provided that "his Majesty and the United States, on mutual requisitions, . . . will deliver up to justice all persons, who, being charged with murder or forgery, committed within the jurisdiction of either, shall seek an asylum within any of the countries of the other." Treaty of Amity, Commerce and Navigation, U.S.-Gr. Brit., art. XXVII, Nov. 19, 1794, 8 Stat. 116, 129. Mexico entered the picture in 1861, when the United States signed an extradition treaty with its southern neighbor at the start of the Civil War. Treaty for the Extradition of Criminals, U.S.-Mex., Dec. 11, 1861, 12 Stat. 1199. The parties agreed to a new treaty in 1899, adding a provision that

forbade extradition "[w]hen the legal proceedings or the enforcement of the penalty for the act committed by the person demanded has become *barred by limitation* according to the laws of the country to which the requisition is addressed." Treaty of Extradition, U.S.-Mex., *supra*, art. III(3), 31 Stat. at 1821 (emphasis added). The parties renegotiated yet again in the late 1970s, producing the treaty that still governs extraditions between the United States and Mexico. Extradition Treaty, U.S.-Mex., *supra*, 31 U.S.T. 5059. That treaty revised the "barred by limitation" provision into its current form, prohibiting extradition "when the prosecution or the enforcement of the penalty" for the charged offense "has become barred by lapse of time according to the laws of the requesting or requested Party." *Id.*, art. 7, 31 U.S.T. at 5064–65.

When the treaty drafters incorporated the phrase "lapse of time" into the United States-Mexico extradition agreement, they were not working on a blank slate. A "lapse of time" provision appeared as early as the United States' 1877 extradition treaty with Spain, which prohibited extradition when "prosecution or punishment" for the charged offense was barred by "lapse of time or other lawful cause." Convention on Extradition, U.S.-Spain, art. V, Jan. 5, 1877, 19 Stat. 650, 653; *see also* Convention for the Extradition of Criminals, U.S.-Neth., art. V, May 22, 1880, 21 Stat. 769, 772. From the start, that language bore a close relationship to statutes of limitations. An 1891 treatise, for example, described the Spanish treaty's "lapse of time" provision as a rule of "prescription," employing a synonym for "statute of limitations" in English and Spanish, and went on to use the phrases "lapse of time," "barred by limitation," and "statutes of limitation" interchangeably in the course of a single paragraph. I John Bassett Moore, *A Treatise on Extradition and Interstate Rendition* § 373, at 569–70 (1891); *see Black's Law Dictionary*, *supra*, at 1321, 1373 (defining "period of prescription," "prescription," and "liberative prescription"); Henry Saint Dahl, *Dahl's Law Dictionary*, *supra*, at 385.

The practice of using these terms as synonyms within the law of extradition continues today. Take our treaty with South Korea, which, in a section titled "Lapse of Time," permits the parties to deny extradition "when the prosecution or the execution of punishment" for the charged offense "would have been barred because of the statute of limitations of the Requested State." Extradition Treaty, U.S.-S. Kor., art. 6, June 9, 1998, T.I.A.S. No. 12,962, at 4; *see* Extradition Treaty, U.S.-Arg., art. 7, June 10, 1997, T.I.A.S. No. 12,866, at 5 (stating, in an

article titled "Lapse of Time," that "[e]xtradition shall not be denied on the ground that the prosecution or the penalty would be barred under the statute of limitations in the Requested State"); *see also* Extradition Treaty, U.S.-Costa Rica, art. 7, Dec. 16, 1982, S. Treaty Doc. No. 98-17, at 3 (1984) (stating, in an article titled "Statute of Limitations," that "[e]xtradition shall not be granted when the prosecution or the enforcement of the penalty . . . has become barred by lapse of time"); Extradition Treaty, U.S.-Colom., art. 6, Sept. 14, 1979, S. Treaty Doc. No. 97-8, at 3 (1981) (same). Or take our treaty with France, which forbids extradition if prosecution is "barred by *lapse of time*" in the requested State but qualifies that prohibition by requiring the requested State to account for certain "[a]cts in the Requesting State that would interrupt or suspend the *prescriptive period*." Extradition Treaty, U.S.-Fr., art. 9, Apr. 23, 1996, T.I.A.S. No. 02-201, at 8 (emphasis added); *see* Extradition Treaty, U.S.-Bulg., art. 6, Sept. 19, 2007, S. Treaty Doc. No. 110-12, at 9 (2008) (using similar language); Extradition Treaty, U.S.-Rom., art. 6, Sept. 10, 2007, S. Treaty Doc. No. 110-11, at 7 (2008) (similar); Extradition Treaty, U.S.-Lux., *supra*, art. 2(6), T.I.A.S. No. 12,804, at 4 (similar); *see also Black's Law Dictionary*, *supra*, at 1321 (defining "period of prescription").

Or take our six treaties with six of the countries in the Organization of Eastern Caribbean States. In sections headed "Lapse of Time," they all say that "[e]xtradition shall not be denied because of the prescriptive laws of either the Requesting State or the Requested State." Extradition Treaties with Organization of Eastern Caribbean States, S. Treaty Doc. No. 105-19, at 11, 33, 55, 77, 98, 120 (1997); *see* Extradition Treaty, U.S.-Belize, art. 8, Mar. 30, 2000, T.I.A.S. No. 13,089, at 5 (using the same language); Extradition Treaty, U.S.-Barb., art. 8, Feb. 28, 1996, S. Treaty Doc. No. 105-20, at 10 (1997) (same); *see also* Extradition Treaty, U.S.-Cyprus, art. 7, June 17, 1996, S. Treaty Doc. No. 105-16, at 7 (1997) (using similar language); Extradition Treaty, U.S.-Trin. & Tobago, art. 6, Mar. 4, 1996, S. Treaty Doc. No. 105-21, at 8 (1997) (similar). When transmitting these treaties to the Senate for its advice and consent, the President described the six identical lapse-of-time provisions as "enabl[ing] extradition requests to be granted irrespective of statutes of limitations" in any State. Extradition Treaties with Organization of Eastern Caribbean States, *supra*, S. Treaty Doc. No. 105-19, at vii; *see also Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 529–32, 535 n.19 (1987) (referencing transmittal materials and Senate documents in the course

of interpreting a treaty). Cruz Martinez offers no contrary drafting or signatory history with respect to these six treaties or the others mentioned above in which anyone thought that the phrase "lapse of time" incorporated the Sixth Amendment's speedy-trial guarantee.

The phrase "lapse of time" also holds a similar meaning in American law, where it has been used in the context of state laws applying out-of-state statutes of limitations to out-of-state causes of action. Consider the Minnesota borrowing statute upheld by the Supreme Court in *Canadian Northern Railway Co. v. Eggen*. 252 U.S. 553 (1920). The statute provided that, "[w]hen a cause of action has arisen outside of this state, and, by the laws of the place where it arose, an action thereon is there *barred by lapse of time*, no such action shall be maintained in this state unless the plaintiff be a citizen of the state who has owned the cause of action ever since it accrued." *Id.* at 558 (emphasis added) (quotation omitted). The Court characterized this statute, phrased in "precisely the same" terms "as those of several other states," as granting a "nonresident the same rights in the Minnesota courts as a resident citizen has, *for a time equal to that of the statute of limitations* where his cause of action arose." *Id.* at 560 (emphasis added).

Viewed against this backdrop—against over a century of law equating "lapse of time" with statutes of limitations—Article 7 of the United States-Mexico Extradition Treaty comes into focus. The article's "lapse of time" language does not incorporate the Sixth Amendment's speedy-trial protections.

*Precedent.* Every case on the books has concluded that this phrase encompasses only statutes of limitations. The Eleventh Circuit faced Cruz Martinez's precise argument and rejected it. Here is what the court said: "Weighing heavily against [the accused's] position is the fact that for over a century, the term 'lapse of time' has been commonly associated with a statute of limitations violation. . . . Thus, we hold that the 'lapse of time' provision in Article 5 of the [United States-Bahamas] Extradition Treaty refers to the running of a statute of limitations and not to a defendant's Sixth Amendment right to a speedy trial." *Yapp*, 26 F.3d at 1567–68. A district court has reached the same conclusion. *Gonzalez v. O'Keefe*, No. C 12-2681 LHK (PR), 2014 WL 6065880, at *2–4 (N.D. Cal. Nov. 12, 2014). So too have several magistrate judges. *In re Extradition of Flores Ortiz*, No. 10-MJ-2016-JMA, 2011 WL 3441618, at *5–6 (S.D. Cal. Feb. 9, 2011); *In re Extradition of Salazar*, No. 09MJ2545-BLM, 2010 WL 2925444, at *6–7

(S.D. Cal. July 23, 2010); *United States v. Garfias*, No. CR-09-xr-90128 EMC, 2009 WL 2580641, at *2–3 (N.D. Cal. Aug. 20, 2009).

Also illustrative of the argument's novelty are the many cases where accused individuals challenged their extradition under treaties with a "lapse of time" provision but failed to even raise a speedy-trial claim, despite long delays in the proceedings. *Skaftouros v. United States*, 667 F.3d 144, 161–62 (2d Cir. 2011) (Greece); *Sainez*, 588 F.3d at 715–17 (Mexico); *Ross v. U.S. Marshal*, 168 F.3d 1190, 1193–95 (10th Cir. 1999) (United Kingdom); *In re Extradition of Ramos Herrera*, 268 F. Supp. 2d 688, 697–99 (W.D. Tex. 2003) (Mexico); *In re Extradition of Suarez-Mason*, 694 F. Supp. 676, 686–87 (N.D. Cal. 1988) (Argentina); *In re Extradition of Liuksila*, 74 F. Supp. 3d 4, 12–15 (D.D.C. 2014) (Finland); *United States v. Gonzalez*, No. CV 13-1867 R(FFM), 2014 WL 1383972, at *7–10 (C.D. Cal. Apr. 9, 2014) (Mexico); *In re Extradition of Johnson*, No. 12-65M, 2012 WL 4973938, at *8–10 (W.D. Pa. Oct. 17, 2012) (Mexico). Not one of the extraditees in these cases thought the speedy-trial point was worth their time—and thus did not argue that the phrase "lapse of time" incorporated the Sixth Amendment right. If imitation is the sincerest form of flattery, its opposite must be the most credible form of disagreement. In another case, the accused *did* raise a speedy-trial claim, but— even though the treaty in question contained a "lapse of time" provision—he grounded his claim in a *different* clause, one giving fugitives "the right to use such remedies and recourses as are provided by the law of the requested Party." *In re Extradition of Kraiselburd*, 786 F.2d 1395, 1397–99 (9th Cir. 1986) (quotation omitted). That's not just the case of the dog who didn't bark. *See Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991). It's the case of the dog who, even when he did bark, chose to bark up a different tree.

*Commentary.* So far as our research and the research of the parties have revealed, all scholars see it the same way. The *Third Restatement of Foreign Relations Law* notes that, "[u]nder most international agreements, state laws, and state practice," an individual "will not be extradited . . . if the applicable period of limitation has expired." *Restatement, supra*, § 476. The commentary to that provision notes that some treaties prohibit extradition if prosecution "has become barred by lapse of time," "if either state's statute of limitations has run," or if there is a "time-bar." *Id.* § 476 cmt. e. Eliminating any doubt, the section concludes by noting that, "[i]f

the treaty contains no reference to the effect of a lapse of time, neither state's statute of limitations will be applied." *Id.* The only way to make sense of the *Restatement*'s discussion is to recognize that each of these terms—"period of limitation," "lapse of time," "time-bar," "statute of limitations"—means the same thing.

The model treaty promulgated by the United Nations to help countries create new extradition regimes points in the same direction. A supplement to that document gives States a variety of options for dealing with a "lapse of time," noting that they may "wish . . . to provide that acts of interruption in the requesting State should be recognized in the requested State." G.A. Res. 52/88, Annex, art. 3(2), U.N. Doc. A/RES/52/88 (Dec. 12, 1997); *see also* G.A. Res. 45/116, Annex, art. 3(e), U.N. Doc. A/RES/45/116 (Dec. 14, 1990). This flexibility, the accompanying best-practices manual explains, stems from the reality that "domestic legal frameworks governing *lapse of time* often vary widely, with various formulae for calculating the expiration of the *statutory period*." U.N. Office on Drugs & Crime, *Revised Manuals on the Model Treaty on Extradition and on the Model Treaty on Mutual Assistance in Criminal Matters* 19 (2006), http://www.unodc.org/pdf/model_treaty_extradition_revised_manual.pdf (emphasis added).

*Default rule.* All of these interpretive indicators reveal that the phrase "lapse of time" excludes speedy-trial protections. But even if there were ambiguity about the point, that would not change things. For ambiguity in an extradition treaty must be construed in favor of the "rights" the "parties" may claim under it. *Factor v. Laubenheimer*, 290 U.S. 276, 293–94 (1933). The parties to the treaty are countries, and the right the treaty creates is the right of one country to demand the extradition of fugitives in the other country—"to facilitate extradition between the parties to the treaty." M. Cherif Bassiouni, *International Extradition: United States Law and Practice* 142 (6th ed. 2014). As the First Circuit explained, *Factor* requires courts to "interpret extradition treaties to produce reciprocity between, and expanded rights on behalf of, the signatories." *In re Extradition of Howard*, 996 F.2d 1320, 1330–31 (1st Cir. 1993); *see also Nezirovic*, 779 F.3d at 239; *Ludecke v. U.S. Marshal*, 15 F.3d 496, 498 (5th Cir. 1994); *United States v. Wiebe*, 733 F.2d 549, 554 (8th Cir. 1984). The point of an extradition treaty after all is to facilitate extradition, as any country surely would agree at the time of signing. *See, e.g.,*

*Ludecke*, 15 F.3d at 498.  In the face of one reading of "lapse of time" that excludes the speedy-trial right and another reading that embraces it, *Factor* says we must prefer the former.

This default rule accords with comity considerations that lurk beneath the surface of all extradition cases.  Courts must take care to avoid "supervising the integrity of the judicial system of another sovereign nation" because doing so "would directly conflict with the principle of comity upon which extradition is based." *Jhirad v. Ferrandina*, 536 F.2d 478, 484–85 (2d Cir. 1976).  Respect for the sovereignty of other countries explains why an American citizen who "commits a crime in a foreign country . . . cannot complain if required to submit to such modes of trial . . . as the laws of that country may prescribe for its own people." *Neely v. Henkel*, 180 U.S. 109, 123 (1901).  And it explains why "[w]e are bound by the existence of an extradition treaty to assume that the trial [that occurs after extradition is granted] will be fair." *Glucksman v. Henkel*, 221 U.S. 508, 512 (1911).  These constraints reflect the reality that "political actors," not judicial ones, are best equipped to make the "sensitive foreign policy judgments" an extradition request demands.  *Hoxha v. Levi*, 465 F.3d 554, 563 (3d Cir. 2006).  The habeas power does not come with the authority to interfere with proceedings "inevitably entangled in the conduct of our international relations" unless the treaty demands it.  *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 383 (1959).  Just last year, the Supreme Court reminded Congress to tread carefully before entangling itself in American foreign policies customarily overseen by the Executive Branch.  *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2094–96 (2015).

Interpreting this treaty in a way that suddenly sweeps speedy-trial rights into its coverage does not honor these objectives and would affirmatively disserve them.  Because the constitutional speedy-trial right has no fixed time limit, in contrast to statutes of limitations, what extraditee will not raise the claim in all of its indeterminate glory?  The mutability of the right makes it impossible to know how much delay is too much delay.  Take the alleged delay in Cruz Martinez's case:  around six years.  Although a delay of one year or more is presumptively prejudicial, six years may not be enough to state a speedy-trial claim in view of other considerations, our court has said, when the government is not to blame for the delay and the defendant does not identify any evidence of prejudice. *See United States v. Bass*, 460 F.3d 830,

838 (6th Cir. 2006). But it very well could be enough to state a claim, another court has said, when the government is to blame and does not "overcome the presumption of general prejudice that applies with considerable force in a case of such extraordinary delay." *See United States v. Velazquez*, 749 F.3d 161, 174, 186 (3d Cir. 2014). What of the question of fault? Whether the State or a defendant is more to blame for untoward delays is "[t]he flag all litigants seek to capture" in a speedy-trial case. *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986). Before we task the courts of both countries with refereeing these elusive and deeply sensitive inquiries, we should be sure the negotiating countries wanted them as umpires.

In the final analysis, Cruz Martinez's argument comes up short. No matter where we look—to the text of this treaty (in English and Spanish), to the text of other treaties, to historical principles underlying those treaties, to judicial decisions interpreting those treaties, to commentaries explaining those treaties, to guidance explaining how to draft those treaties, to the *Factor* default rule—all roads lead to the same conclusion. The United States and Mexico did not impose a speedy-trial limit when they forbade the extradition of fugitives whose "prosecution" was "barred by lapse of time."

2.

In arguing that "lapse of time" means something else, Cruz Martinez notes that this is not the first extradition treaty between the United States and Mexico. The present version, he points out, replaced the phrase "barred by limitation" from the previous treaty with the phrase "barred by lapse of time." *Compare* Treaty of Extradition, U.S.-Mex., *supra*, art. III(3), 31 Stat. at 1821, *with* Extradition Treaty, U.S.-Mex., *supra*, art. 7, 31 U.S.T. at 5064–65. In the process, he submits, it expanded the scope of the provision to cover speedy-trial rights.

But this argument assumes that the new phrase captures more ground than the old phrase with respect to the issue at hand. It does not. The word "time" appears nowhere in the phrase "barred by limitation." But the context of the treaty and all authority interpreting it show that the phrase refers only to *time* limitations—not anything and everything that might "limit[]" a criminal prosecution, such as *all* of the criminal procedure protections that appear in the Bill of Rights and *all* of the state and federal laws that protect criminal suspects. That the old phrase

impliedly included a time limitation eliminates the significance of the new phrase's reference to "time" no matter how the phrase is glossed: "time bar," "time limitation," "lapse of time," "lapse in time," "passage of time," and so on. Cruz Martinez recognizes as much when he concedes that the phrase "barred by limitation" restricted the old treaty's *time-bar provision to the operation of statutes of limitation.*" Cruz Martinez Principal Br. 48 (emphasis added). If the old treaty contained a "time-bar provision," there is nothing about the new language that *adds* to the provision's breadth—and thus nothing that gives Cruz Martinez traction in claiming that it suddenly extends to speedy-trial rights.

The treaty's drafting history confirms as much. Its transmittal materials do not mention the Sixth Amendment once, an omission that takes on special significance in light of the Senate Committee on Foreign Relations' decision to include a list of differences between the new treaty and "previously ratified" ones. S. Exec. Rep. No. 96-21, at 19 (1979). The speedy-trial right appears nowhere on that list.

One court at one point, it is true, agreed with Cruz Martinez's reading of the phrase "lapse of time." The district court in *In re Extradition of Mylonas* ruled that "lapse of time or other lawful cause" in the United States-Greece extradition treaty applied to speedy-trial violations. 187 F. Supp. 716, 721 (N.D. Ala. 1960). But this was hardly a landmark extradition decision. The opinion contained no analysis of the issue, just a half-sentence conclusion. *Id.* And when it came time to assess whether an explanation for the *Mylonas* court's conclusion could be found, the Eleventh Circuit came up dry, and "expressly disapprove[d]" the district court's ruling. *Martin*, 993 F.2d at 829 n.8. The Eleventh Circuit disapproved of *Mylonas* again the next year, stating that it did "not find [the opinion] persuasive." *Yapp*, 26 F.3d at 1567. We need not resurrect this twice-buried decision by concluding that the extradition treaty drafters incorporated it into the phrase "lapse of time," contradicting over a century of jurisprudence in the process.

Nor does it matter that *Mylonas* was still on the books when the United States and Mexico negotiated their revised extradition treaty, because this treaty does not use the same language as the treaty discussed in *Mylonas*. That one said "lapse of time *or other lawful cause,*" 187 F. Supp. at 721 (emphasis added); this one says "lapse of time" alone. It would be odd to

conclude that the treaty's drafters meant to adopt this trial court's decision (if indeed they had ever heard of it) but then used different—and narrower—language.

Other agreements drafted during the same period as the United States-Mexico treaty confirm that *Mylonas* was not on anyone's radar. At least seven extradition treaties drafted between 1960 (when *Mylonas* was handed down) and 1993 (when the Eleventh Circuit disapproved it) include provisions similar to Article 7 of the United States-Mexico treaty. Treaty Relating to Extradition, U.S.-Thai., art. 7, Dec. 14, 1983, S. Treaty Doc. No. 98-16, at 3; Extradition Treaty, U.S.-It., art. VIII, Oct. 13, 1983, 35 U.S.T. 3023, 3030; Extradition Treaty, U.S.-Costa Rica, *supra*, art. 7, S. Treaty Doc. No. 98-17, at 3; Treaty on Extradition and Mutual Assistance in Criminal Matters, U.S.-Turk., art. 3(c), June 7, 1979, 32 U.S.T. 3111, 3116–17; Treaty on Extradition, U.S.-Para., art. 5(3), May 24, 1973, 25 U.S.T. 967, 973; Treaty on Extradition and Cooperation in Penal Matters, U.S.-Uru., art. 5(3), Apr. 6, 1973, 35 U.S.T. 3197, 3207; Treaty on Extradition, U.S.-N.Z., art. VI(3), Jan. 12, 1970, 22 U.S.T. 1, 4. The Senate Executive Reports accompanying each of these documents indicated that "lapse of time" referred to statutes of limitations. S. Exec. Rep. No. 98-29, at 5 (1984) (Thailand); S. Exec. Rep. No. 98-33, at 4–5 (1984) (Italy); S. Exec. Rep. No. 98-30, at 6 (1984) (Costa Rica); S. Exec. Rep. No. 96-18, at 6 (1979) (Turkey); S. Exec. Rep. No. 93-19, at 3 (1973) (Paraguay, Uruguay); S. Exec. Rep. No. 91-20, at 3–4 (1970) (New Zealand). A 1968 State Department digest on international law points in the same direction, noting that "[o]ne of the most common exemptions from extradition relates to offenses for which prosecution or punishment is barred by lapse of time, usually referred to as barring by 'lapse of time', prescription, or statute of limitation." 6 Whiteman, *Digest of International Law, supra*, § 17, at 859. We have not found, and Cruz Martinez has not produced, evidence suggesting that anyone meant to deviate so drastically from a consensus so settled.

But, Cruz Martinez persists, doesn't *Doggett v. United States* indicate that time alone *may* do the barring in some speedy-trial cases—which means the phrase "lapse of time" necessarily incorporates, as a textual matter, constitutional speedy-trial protections? 505 U.S. 647 (1992). Cruz Martinez points in particular to *Doggett*'s statement that, "[w]hen the Government's negligence . . . causes [a six-year delay], and when the presumption of prejudice, albeit

unspecified, is neither extenuated, as by the defendant's acquiescence, nor persuasively rebutted, the defendant is entitled to relief." *Id.* at 658. Far from validating Cruz Martinez's inference, however, that sentence supports the opposite one. *Even though* a lengthy lapse of time occurred, Doggett was "entitled to relief" only because he pointed to several other factors, including "the Government's negligence" and his failure to "acquiesce[]" in the postponed proceedings. *Id.* That holding comports with the Court's statement in *Barker* that none of the four factors analyzed in speedy-trial cases, not even the passage of time, has "talismanic qualities" and that courts must always "engage in a difficult and sensitive balancing process." 407 U.S. at 533.

Nor does *Doggett* tell us anything about the role of the Speedy Trial Clause when the United States extradites an American citizen to a foreign nation. *Doggett*, it is true, establishes that individuals who are extradited *to* the United States *from* a foreign country receive speedy-trial protections in American courts, just like any litigant who faces "domestic criminal proceedings." *Balsys*, 524 U.S. at 672. But that observation breaks no new ground: Individuals tried in American courts receive American protections, including all of the criminal procedure guarantees of the Bill of Rights, just as individuals tried in Mexican courts (as Cruz Martinez might be) receive Mexican protections. *Doggett* merely explains how the Speedy Trial Clause affects extraditees *after* their return to the United States, but it sheds no light on the meaning of "lapse of time" as applied to the threshold decision whether to extradite an individual under the terms of a treaty.

The dissent raises two concerns about our translation of the word "prescripción" from the official Spanish language version of the treaty: that the parties did not raise the point in their appellate briefs and that we are not experts in Spanish. Both are fair points, but they submit to fair answers. During oral argument, one of our colleagues (Judge Rogers) asked the parties about the meaning of the Spanish term and about his understanding that the term is associated with statutes of limitations in civil law countries. The parties responded to his point at argument and filed letters in response after the argument. Use of dictionaries by courts, even dictionary definitions not cited by the parties, is not an unusual phenomenon. As for the second concern, the dissent is correct that we do not speak Spanish fluently. But that explains why we have consulted Spanish–English dictionaries and English–Spanish dictionaries, just as the Supreme

Court has done in interpreting other treaties. *Floyd*, 499 U.S. at 536–37; *Saks*, 470 U.S. at 399–400.

The context of this interpretive dispute—language in an extradition treaty—dispenses with another of Cruz Martinez's rejoinders: that, in other circumstances, the lapse-of-time shorthand can refer not just to statutes of limitations but also to other doctrines rooted in the passage of time. Take a comment in the *Third Restatement* equating "[l]apse of time" with a "delay in presentation" due to "negligence or laches." *Restatement, supra*, § 902 cmt. c (emphasis omitted). Section 902, however, concerns not extradition but country-versus-country disputes where one State violates an obligation owed to another. The section thus does not prove that the phrase "lapse of time" incorporates an *individual* speedy-trial right in this setting, especially when the one pertinent comment from the *Restatement* indicates that, for extradition purposes, the term "lapse of time" extends to limitations periods only. *Id.* § 476 cmt. e.

"Lapse of time," it is true, might well have a broader meaning in isolation. It might mean all kinds of things in other settings. Witness Hamlet's plaintive request to his father's ghost: "Do you not come your tardy son to chide, [t]hat, lapsed in time and passion, lets go by [t]he important acting of your dread command?" William Shakespeare, *Hamlet* act 3, sc. 4. The question, however, is what words mean in their context, not in the abstract or in other settings. To think otherwise about the matter calls to mind the spelunker who leaves home with an excellent map and a broken headlamp. One is of no use without the other. So too of text without context. Not a single extant source of authority in *this* context—the language of an international extradition treaty—equates "barred by lapse of time" with "barred by the Sixth Amendment."

By shearing the phrase "lapse of time" from its context, moreover, Cruz Martinez introduces a serious complication. If "lapse of time" covers the constitutional speedy-trial guarantee, there is no reason to think it would not cover the statutory one. The Speedy Trial Act says that "the trial of a defendant charged . . . with the commission of an offense shall commence within seventy days" of the indictment, information, or the defendant's appearance before the court, whichever occurs later. 18 U.S.C. § 3161(c)(1). When the Act's provisions are violated, the court has discretion (after considering several statutorily defined factors) to dismiss the case with or without prejudice. *Id.* § 3162(a)(2); *United States v. Taylor*, 487 U.S. 326, 332–37

(1988). These provisions would leave foreign nations with just seventy days to issue any extradition request after the Act's clock starts ticking if they want to avoid debates about whether any delay was excusable. *See* 18 U.S.C. § 3161(h). What will happen next is the kudzu-like spreading of Speedy Trial Act claims and the choking out of statute-of-limitations claims—and thus the choking out of the *one claim* that all agree is covered by the phrase "barred by lapse of time." In case after case, extradition requests that violate no statute of limitations will be denied for Speedy Trial Act violations.

Think about Cruz Martinez's situation. The American and Mexican statutes of limitations have not run, but because more than seventy days have passed since Mexico issued an arrest warrant for Cruz Martinez, the Speedy Trial Act would (if applied) likely prevent his extradition. The same is true of other cases. Consider *United States v. Garfias*, where the United States' statute of limitations did not bar Garfias's extradition, but the Speedy Trial Act would likely have done so due to the nearly eight-year delay between Mexico's arrest warrant and its extradition request. 2009 WL 2580641, at *1, *3–5. And the list goes on. *E.g.*, *Sainez*, 588 F.3d at 715–17 (no statute of limitations violation in a case where there was a seven-year gap between the issuance of a Mexican arrest warrant and the extradition request); *In re Flores Ortiz*, 2011 WL 3441618, at *1, *6–7 (no statute of limitations violation in a case where there was a nearly three-year delay between the issuance of a Mexican arrest warrant and the extradition request); *In re Salazar*, 2010 WL 2925444, at *4–5 (no statute of limitations violation in a case where there was a nearly ten-year delay between the issuance of a Mexican arrest warrant and the extradition request). Were Cruz Martinez's argument to succeed, it is difficult to imagine a lapse-of-time case where the most fruitful line of attack would not be the statutory, or for that matter the constitutional, speedy-trial claim.

Cruz Martinez concludes by noting that, because the phrase "barred by lapse of time" *could* be read broadly, it *must* be read broadly. He quotes the Supreme Court's admonition in *Factor* that treaty "obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them." 290 U.S. at 293. And he tells us to look at each section of the extradition treaty individually, classifying every provision as either an extradition-authorizing or extradition-limiting one. After we have done so, he adds, we

should expansively interpret the authorizing provisions in favor of the nation that seeks extradition, and we should expansively interpret the limiting provisions in favor of the fugitive. Because the "lapse of time" provision places limits on extradition and accords rights to the accused, Cruz Martinez insists, a "liberal[]" interpretation requires us to infer that this language incorporates speedy-trial protections. *Id.*

But a distinction between authorizing and limiting provisions does not exist in extradition law and would not work in any event. The provision at issue in *Factor*, for example, listed the specific crimes for which an individual could be extradited—but is that provision better conceived as *authorizing* extradition for the specified crimes or as *limiting* extradition to those crimes? *Id.* at 287–90 & nn.1–2. Even if we assume that the provision authorizes extradition, what do we do when there are *two* provisions at issue? In *Factor* itself, the Court asked whether the section listing extraditable offenses was limited by a provision stating that individuals could be extradited "only . . . upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the crime or offence had there been committed." *Id.* at 287 n.1, 290–91 (quotation omitted). If Cruz Martinez's reading were correct, the Court in *Factor* would have found itself at a standstill—required to interpret the authorizing provision in favor of extradition but the limiting provision in favor of the fugitive. That's not very useful. This granular, section-by-section approach not only fails to explain *Factor*; it fails to provide courts with any administrable rule at all.

No such rule exists, as the cases cited by Cruz Martinez demonstrate. In some of those cases, the Supreme Court simply assessed treaty language using conventional interpretive techniques without resorting to the *Factor* canon (and even, in one case, rejecting that canon's applicability). *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 10–18 (1936); *Pettit v. Walshe*, 194 U.S. 205, 217–20 (1904); *United States v. Rauscher*, 119 U.S. 407, 419–30 (1886). In others, the Court interpreted "[f]riendship, [c]ommerce and [n]avigation treaties," not extradition treaties, between the United States and another country—treaties that "were primarily concerned with the trade and shipping rights of individuals." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 186–87 (1982). The Court, no surprise, interpreted ambiguous

individual-rights-creating provisions in those treaties, as opposed to extradition treaties, with an eye toward maximizing individuals' rights. *Nielsen v. Johnson*, 279 U.S. 47, 51–52, 57–58 (1929); *Jordan v. Tashiro*, 278 U.S. 123, 127–30 (1928); *Asakura v. City of Seattle*, 265 U.S. 332, 342–44 (1924); *Geofroy v. Riggs*, 133 U.S. 258, 271–73 (1890). The same reasoning does not apply to an extradition treaty designed to create a right that would not exist in the treaty's absence: the right of a State to demand the "surrender of a fugitive" living in another State. *Factor*, 290 U.S. at 298.

That leaves what may be Cruz Martinez's ultimate worry: that rejecting his interpretation of the treaty would allow Mexico to seek extradition of an American citizen years after a valid Mexican arrest warrant has issued. Just such a prospect exists here, he says, given his claim that he never tried to hide his address from American or Mexican authorities. But it is not this court's "province" to limit the treaty's scope in search of a seemingly "desirable result." *Cf. EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015). Otherwise, the treaty would mean one thing for some fact patterns and something else for other fact patterns. Treaty interpretation, as opposed to executive branch discretion, does not turn on shifting fact patterns. Cruz Martinez's arguments on this score are most productively (and, we would add, quite fairly) directed to the Secretary of State, who retains "sole discretion to determine whether or not [an individual] should actually be extradited." *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997); *see* 18 U.S.C. § 3186; *Restatement, supra*, § 478 cmt. d. That discretion would prevent *any* untoward extradition from going forward, potentially including this one—which is why Cruz Martinez's requests for relief are better directed to our diplomats than to our judges.

III.

Cruz Martinez raises two final challenges. He argues that the magistrate judge abused his discretion by denying discovery of documents related to 2009 communications between American officials and the Oaxacan court. So far as the record shows, however, the magistrate judge did not deny anything. He ordered the United States to produce "any exculpatory materials in its possession that would undercut a finding that there is probable cause" that Cruz Martinez committed the double murder. R. 2-7 at 1. The government confirmed that it had inquired with the relevant entities, that it did "not have any exculpatory evidence," and that all

pertinent evidence had "been provided to the [c]ourt." R. 2-9 at 4. Cruz Martinez received all the discovery he was entitled to in an extradition proceeding. *In re Extradition of Drayer*, 190 F.3d 410, 415 (6th Cir. 1999).

Cruz Martinez next claims that his provisional arrest was illegal because the extradition treaty permits this sort of arrest only "[i]n the case of urgency." Extradition Treaty, U.S.-Mex., *supra*, art. 11(1), 31 U.S.T. at 5068. Relatedly, he says he was denied procedural due process because the magistrate judge never held a hearing to address the "urgency" issue within the sixty-day period during which he was provisionally detained. But Cruz Martinez's provisional arrest ended when Mexico submitted its formal extradition request, which means, as the panel majority correctly concluded, that his challenges to that arrest are moot. Nor is there any risk that he will "again be subjected to the alleged illegality" of an unjustified provisional detention. *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). If the United States hands him over to Mexico, his troubles here will be over (though his troubles there will be starting). And if the Secretary of State elects not to honor the extradition request, Mexico will be able to seek Cruz Martinez's extradition a second time *without* requesting a provisional arrest; it can trigger the United States' statutory detention authority simply by resubmitting its already prepared formal extradition request. 18 U.S.C. § 3184. Absent any realistic risk of future provisional arrests, we have no authority to hear Cruz Martinez's challenges to this one.

IV.

For these reasons, we affirm.

---

**CONCURRENCE IN THE JUDGMENT**

---

HELENE N. WHITE, Circuit Judge, concurring in the judgment. I agree that Article 7 does not incorporate the Sixth Amendment right to a speedy trial, but cannot join in the majority's textual analysis.

As the principal dissent observes, the phrase "barred by lapse of time according to the laws of the requesting or requested Party" does not clearly exclude the speedy-trial right. The majority reads Article 7 to apply only to fixed-time limitations, Maj. Op. 7–8, but this conclusion does not follow from the text alone. True, the determination whether prosecution violates a defendant's speedy-trial right requires consideration of factors other than the mere lapse of time, but the statute-of-limitations defense may involve consideration of other factors as well. For example, federal statutes of limitation are tolled if the defendant is "fleeing from justice," 18 U.S.C. § 3290, which requires the government "to prove by a preponderance of the evidence that [the defendant] concealed himself with the intent of avoiding prosecution," *United States v. Greever*, 134 F.3d 777, 781 (6th Cir. 1998), and Tennessee statutes of limitation are tolled if the defendant "conceals the fact of the crime" or "was not usually and publicly resident within the state." Tenn. Code Ann. § 40-2-103. Thus, the statute-of-limitations analysis does not always involve simply "pointing to a calendar and counting off the days," Maj. Op. 8, and cannot be distinguished from the speedy-trial inquiry on that basis. In any event, the speedy-trial right is fundamentally a protection against undue prosecutorial delay, which is, essentially, a lapse of time. *Barker v. Wingo*, 407 U.S. 514, 519–22 (1972).

The majority also contends that the speedy-trial right does not bar "prosecution" because the right operates after indictment or its equivalent. Maj. Op. 8–9. But a violation of the right requires dismissal, and thus bars "the prosecution or the enforcement of the penalty." Indeed, it is unclear whether the majority would hold that the provision of the Oaxacan statute of limitations that addresses post-arraignment and post-verdict delay is applicable under the "lapse of time" clause, Dis. Op. 43, or whether it too fails to fall within the meaning of the phrase.

Nevertheless, I agree with the majority that the history and context of the Treaty—particularly the transmittal materials and the meaning given the identical phrase in other treaties—persuasively support the conclusion that Article 7 does not incorporate the speedy-trial right.[1]

---

[1]The absence of a change to the Spanish-language version of the new treaty also supports the conclusion that the change of language in the English-language version was not intended to incorporate the speedy-trial right.

_____

**DISSENT**

_____

CLAY, Circuit Judge, dissenting. The majority rejects the possibility that a clause incorporating "lapse of time" defenses in the extradition treaty in question may include constitutional speedy trial protections. Rather, the majority claims, the phrase "lapse of time" refers only to a fixed statutory limitations period. But the majority cannot point to any part of the 1978 Treaty that supports its interpretation of Article 7. Instead, the majority leaves out the most important facts, disregards both the plain language and the plain purpose of Article 7, relies on a cascade of inapposite citations, and rests its conclusion on an erroneous presumption in favor of extradition.

In assessing whether Cruz Martinez's speedy trial rights were violated, here is what the majority left out of its opinion. Unexplained and lengthy delays stretched more than six years from the issuance of the Mexican arrest warrant to the time Mexico requested Cruz Martinez's arrest. Cruz Martinez was not a fugitive, nor had he any knowledge that he was wanted by U.S. or Mexican authorities. To the contrary, he lived openly in the United States under his own name and had willingly returned to Mexico multiple times both for immigration purposes and to vacation with his family. Yet, prior to his arrest, which came nearly *seven and a half years after* Cruz Martinez's alleged crime was reported to the Mexican authorities, neither he nor his family was ever informed of the outstanding warrant.

What happened to Cruz Martinez is precisely the sort of delay against which Article 7 was designed to protect. In applying the unambiguous textual prerequisites of the 1978 Treaty to the facts of this case, it is clear that the rights guaranteed to those facing extradition under Article 7 include the protection against untimely prosecution—a protection embodied in the Sixth Amendment's Speedy Trial Clause. Read for its ordinary meaning, this language incorporates those bodies of law in both countries that protect against untimely criminal prosecution. The Sixth Amendment's Speedy Trial Clause falls squarely within this scope.

Since a literal reading of Article 7 incorporates the speedy trial right, Cruz Martinez should be able to raise as a defense that his extradition is barred under the terms of the governing treaty. But the analysis does not end there. Contrary to what the majority suggests, this dissent does not contend that Cruz Martinez's speedy trial rights under the Sixth Amendment have in fact been violated; rather, that determination should be made by the district court on remand. To arrive at such a determination, the Supreme Court has outlined four factors to be weighed in a balancing test. *See Barker v. Wingo*, 407 U.S. 514, 529-30 (1972) (holding that courts are to consider the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."). Because the district court never reached the *Barker v. Wingo* test for constitutional speedy trial violations, it is imperative that this case be remanded for further consideration.

Regrettably, the majority fundamentally misapprehends the principal issue. The majority's holding would allow the United States government to extradite one of its own citizens to face prosecution in Mexico even if doing so would result in a criminal prosecution of the U.S. citizen in violation of the U.S. Constitution. The 1978 Treaty between the United States and Mexico was designed to prevent this outcome: it forbids extradition if criminal prosecution "has become *barred by lapse of time* according to the laws of the requesting or *requested* Party." Extradition Treaty, U.S.-Mex., art. 7, May 4, 1978, 31 U.S.T. 5059 (emphasis added).[1] This reciprocal language is not ambiguous and means only one thing: if an extraditee's criminal prosecution would be barred due to the lapse of time in the United States, then his extradition to the requesting country must be refused; and vice versa, if an extraditee's criminal prosecution of a Mexican citizen would be barred by the laws of Mexico, his extradition to the requesting country would likewise be prohibited.

---

[1]Judge White's separate concurrence completely misunderstands or glosses over the Treaty's reciprocal effect. The conclusory concurrence gives the misimpression that the crux of this case is reducible to whether the phrase "barred by lapse of time" gives Cruz Martinez a right to a speedy trial. But that phrase should not be read in isolation from the phrase that follows it—namely, "according to the laws of the requesting or requested Party." 1978 Treaty, art. 7. Construed together, this language means that the Treaty incorporates the body of relevant law of *both* countries. And because the United States recognizes the speedy trial right, Cruz Martinez can raise that as a defense to his extradition to Mexico.

I.

Again, what the majority fails to acknowledge is the total absence of any indication that Cruz Martinez was a fugitive who fled Mexico to avoid prosecution. Here is the full story.

At the time of the shooting, Cruz Martinez was a lawful permanent resident of the United States and had been continuously living and working in this country, with that status, for more than fifteen years. Despite his residence in the United States, Cruz Martinez frequently traveled back to Santa María Natividad, where his family lived, including his wife and children. Santa María Natividad "is a very small village where basically everyone knows each other." (R. 2-17, Declaration of Antolina Flores Alfaro, PageID# 327.)

As the majority indicates, after the shooting on December 31, 2005, in which Cruz Martinez was allegedly involved, the town clerk of Santa María Natividad presided over a meeting between Cruz Martinez's wife and brother, on the one side, and the widow and parents of one of the shooting victims, Solano Cruz, on the other. At that meeting, both families signed an agreement that had been drafted by the "District Court for San Pedro Silacayoapan, Oaxaca." (*Id.* at 335.) The agreement identified Cruz Martinez as the person "who committed the homicide" and provided that his family would pay 50,000 pesos to the family of Solano Cruz. (*Id.*) The 50,000 peso payment, however, was not the only purpose of the agreement. The agreement concluded with the following language:

> The Town Clerk, for his part, as an authority of the community, asks that both parties respect these agreements, which were issued in the district to which we belong. He also asks that none of the parties in this matter holds a grudge, as we maintain respect towards one another in our community, especially because this unfortunate act took place between families. He asks that once the parties accept this agreement and commit to enact its terms, that the matter shall be closed.

(*Id.* at 335-36.)

Cruz Martinez's wife "understood that the agreement resolved the case and that [Cruz Martinez] would not be charged with any crime." (*Id.* at 328.) She explained that the family of the other victim, Antolín Cruz Reyes, "has never claimed that [Cruz Martinez] committed any crime against Cruz Reyes." (*Id.* at 327.)

But in an entirely separate series of events, and unbeknownst to Cruz Martinez and his family, a cousin of Solano Cruz who was not a party to the agreement reported the homicide to the Attorney General for the State of Oaxaca in January 2006. The cousin, a witness to the shooting, gave the state authorities a firsthand account of what happened. A deputy municipal official who was also present at the scene gave a corroborating statement on the same date. Based on these statements and the investigation that followed, on February 23, 2006, the Oaxacan authorities issued a warrant for Cruz Martinez's arrest on charges of homicide with "unfair advantage" resulting from his use of a firearm. (R. 2-13, Extradition Packet, PageID# 202.)

Meanwhile, Cruz Martinez had returned to the United States, where he continued to live openly under his own name. His landlord verified in a letter submitted to the district court that he had lived in the same apartment in Lebanon, Tennessee since April 2006. The uncontested evidence below established that Cruz Martinez's family in Santa María Natividad was never informed of the warrant for his arrest. Cruz Martinez's wife and children continued to live in Santa María Natividad until 2007, when they left to join him in the United States, in part because of harassment from the family of Solano Cruz. Even after 2007, Cruz Martinez's brother and father continued to live in the community and remained there as of the commencement of the extradition proceedings in 2013. Yet in all this time, Cruz Martinez's family was never informed of a warrant or of any case pending against him. Even beyond Cruz Martinez's family, it was common knowledge in the tight-knit community of Santa María Natividad that he lived and worked in the United States.

There is no indication at all in the record of when the Mexican government first learned of Cruz Martinez's whereabouts in the United States. Certainly no obstacle to discovering his location has ever been identified. It is more accurate to say that despite the existence of a variety of avenues readily available for ascertaining Cruz Martinez's location—whether by communication with his family or acquaintances in Santa María Natividad, or by simple inquiry or background check within the United States—the Mexican government made no effort that is reflected in the record of these proceedings to search for him or to obtain his extradition for more than six years.

In an unexplained turn of events, it was the United States government that next followed up on the Mexican arrest warrant. In September 2009, more than three and a half years after the shooting, a U.S. Consular Official contacted the Silacayoapan district court to inquire about the status of the warrant. The court responded that the warrant was still "pending and executable." (*Id.* at 250-51.) The record does not reflect that any further action was taken and the United States government has refused to disclose any records related to the 2009 inquiry.

On May 21, 2012, Mexico submitted a diplomatic note to the U.S. Department of State invoking the "urgency" clause of the 1978 Treaty to request Cruz Martinez's provisional arrest. *See* 1978 Treaty, art. 11. The note explained that "[t]he URGENCY to present the request . . . is justified by the fact that AVELINO CRUZ MARTINEZ has been located" at a given address in Lebanon, Tennessee and that "[i]t is feared that he may move elsewhere and his whereabouts will become unknown." (R. 2-6, Initial Extradition Request, PageID# 80.) In October 2012, months after Mexico submitted its request for Cruz Martinez's provisional arrest, both the United States and Mexico issued posters identifying Cruz Martinez as wanted on murder charges in Mexico. Nevertheless, no attempt was made to arrest him in 2012.

During this period, Cruz Martinez, who had obtained U.S. citizenship in October 2010, was working to obtain lawful permanent resident status for his wife and children. In late 2012 or early 2013, he made a number of trips to Mexico to meet with U.S. consular officials—the very same governmental agency that made the 2009 inquiry. The purpose of his trip was to seek immigration waivers for his family. During these multiple trips, neither Mexican nor U.S. authorities took any steps to detain him or to inform him of the pending warrant and extradition request; nor was he prevented from returning to the United States.

On June 11, 2013, acting on behalf of the Mexican government, the United States filed a complaint in the Middle District of Tennessee seeking Cruz Martinez's provisional arrest for the purposes of extradition. Cruz Martinez was finally arrested on June 21, 2013, nearly seven and a half years after the shooting was reported to the Mexican authorities, and seven years and four months after the issuance of the arrest warrant.

II.

I concur in the majority's holding that Cruz Martinez's extradition is not barred under Article 7 by the U.S. statute of limitations. The Mexican arrest warrant was the functional equivalent of an indictment and should be granted the same tolling effect. *See Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) ("[F]or the purpose of a civil proceeding such as an extradition, a Mexican arrest warrant is the equivalent of a United States indictment and may toll the United States statute of limitations."). However, I part ways with the majority as to whether Article 7 incorporates the Sixth Amendment's right to a speedy trial.

### A.  *Treaty Interpretation*

The Supreme Court has made clear that any analysis of whether Article 7 incorporates the Sixth Amendment's Speedy Trial Clause must begin "with the text of the treaty and the context in which the written words are used." *Air France v. Saks*, 470 U.S. 392, 397 (1985). And where the text is clear, as it is here, neither pages of inapposite citations, nor an erroneous presumption in favor of extradition, provides a basis for deviating from this "time-honored textual approach." *Medellín v. Texas*, 552 U.S. 491, 514 (2008); *see also Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 134 (1989) ("[W]here the text is clear, as it is here, we have no power to insert an amendment.").

In interpreting a treaty, as in interpreting a statute, the Supreme Court has directed that courts must first look to its plain language. *See Medellín*, 552 U.S. at 506 ("The interpretation of a treaty, like the interpretation of a statute, begins with its text.); *Air France*, 470 U.S. at 399 (noting that courts must give "the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties."). The text of a treaty must be "interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in light of its object and purpose." Vienna Convention on the Law of Treaties, May 23, 1969, art. 31(1), 1155 U.N.T.S. 331; *Restatement (Third) of Foreign Relations Law of the United States* ("*Restatement*") § 325(1) (1986). Only if the language of a treaty, when read in the context of its structure and purpose, is ambiguous may courts "resort to extraneous information like the history of the treaty, the content of negotiations concerning the treaty, and

the practical construction adopted by the contracting parties." *Kreimerman v. Casa Veerkamp, S.A. de C.V.*, 22 F.3d 634, 638 (5th Cir. 1994) (citing *Eastern Airlines*, 499 U.S. at 535).

Finally, courts may not "alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial," for doing so "would be . . . an usurpation of power, and not an exercise of judicial function." *Id.* (quoting *Chan*, 490 U.S. at 135). Therefore, a high bar must be met before a court can read into a treaty a meaning which its words do not import. *See Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 180 (1982) ("The clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'") (quoting *Maximov v. United States*, 373 U.S. 49, 54 (1963)).

**B.  Plain Meaning Analysis**

Again, Article 7 provides that "[e]xtradition shall not be granted when the prosecution or the enforcement of the penalty for the offense for which extradition has been sought has become barred by lapse of time according to the laws of the requesting or requested Party." 1978 Treaty, art. 7. Read for its ordinary meaning, this language incorporates those bodies of law in both countries that protect against untimely criminal prosecution. The Speedy Trial Clause of the Sixth Amendment falls squarely within this scope. In accordance with that fundamental constitutional guarantee, a criminal prosecution "become[s] barred by lapse of time according to the laws" of the United States—to borrow the language of Article 7—when unjustified post-accusation delay results in prejudice to the defendant, or when it extends over so significant a period that prejudice will be presumed. *Doggett v. United States*, 505 U.S. 647, 651, 657-58 (1992); *Klopfer v. North Carolina*, 386 U.S. 213, 226 (1967) (holding that the right to a speedy trial "is one of the most basic rights preserved by our Constitution.").

While it is true, as the majority observes, that the passage or lapse of time is never alone dispositive of a speedy trial claim, the same may be said of statutes of limitations challenges. Both bodies of law take into account the timely or untimely action of the government, as the majority explains in its tolling discussion. Similarly, defendants may be precluded from relying on either defense if the delay results from their own intentional flight from justice. *See*

18 U.S.C. § 3290; *Doggett*, 505 U.S. at 652-54 (analyzing whether the defendant was aware of the charges against him during the eight years that elapsed before his discovery and arrest). Although these caveats introduce additional factors into the analysis, the essential force and fundamental basis of both the Speedy Trial Clause and statutes of limitation is the same: the passage or "lapse" of time.

Indeed, under our legal system, the protection against untimely prosecution is incomplete without the Speedy Trial Clause, which operates in concert with statutes of limitation and the Due Process Clause to protect against prejudicial prosecutorial delay. *See United States v. Marion*, 404 U.S. 307, 320-25 (1971) (discussing the interlocking protection provided by statutes of limitation, the Speedy Trial Clause, and the Due Process Clause); *see also United States v. Lovasco*, 431 U.S. 783, 788-89 (1977) (same); *Klopfer*, 386 U.S. at 226 (observing that each of the fifty states guarantees the right to a speedy trial). The Eleventh Circuit explained the complementary roles played by statutes of limitation and the Speedy Trial Clause in protecting against prejudice arising from the "lapse of time" in *Stoner v. Graddick*, 751 F.2d 1535 (11th Cir. 1985):

> The statute of limitations is the principal device, created by the people of a state through their legislature, to protect against prejudice arising from a lapse of time between the commission of a crime and an indictment or arrest. Statutes of limitation represent legislative assessments of relative interest of the state and the defendant in administering and receiving justice. Limitations statutes, however, are not the only available protection against prejudice. The particular provisions of the Speedy Trial Clause of the Sixth Amendment are available with respect to prejudicial delay after formal indictment or information, or actual arrest.

*Id.* at 1540-41 (citations and quotation marks omitted).

It is therefore simply inaccurate to suggest, as the majority does, that a criminal prosecution is "barred by lapse of time according to the laws" of the United States only where there is a statute of limitations framework in place to protect the rights of the accused. *See* 1978 Treaty, art. 7. The corresponding post-accusation protection found in the Speedy Trial Clause is an equally important defense "against prejudice arising from a lapse of time" under U.S. law. *Stoner*, 751 F.2d at 1540. The only way to give full effect to Article 7's lapse of time language is to find that the provision incorporates these complementary protections.

Not only is the Speedy Trial Clause a central component of the protection against untimely prosecution, but it is also well established that criminal defendants may raise a speedy trial defense when the U.S. government has failed to timely pursue their extradition. *See Doggett*, 505 U.S. at 651-58 (finding a speedy trial violation where the U.S. government did not request the defendant's extradition from Panama and did not seek to confirm his location during the following eight years); *United States v. Heshelman*, 521 F. App'x 501, 505-10 (6th Cir. 2013) (holding that the U.S. government's failure over more than three years to pursue extradition of a suspect living in Switzerland, where the suspect was not informed of the charges against him, constituted a speedy trial violation); *United States v. Mendoza*, 530 F.3d 758, 763 (9th Cir. 2008) ("[T]he government was required to make some effort to notify Mendoza of the indictment, or otherwise continue to actively attempt to bring him to trial, or else risk that Mendoza would remain abroad while the constitutional speedy-trial clock ticked. However, the government made no serious effort to do so.").

If the roles of the two countries here were reversed, there is no doubt that Cruz Martinez would be able to invoke his constitutional speedy trial right in a U.S. prosecution based on the government's failure to timely seek his extradition from Mexico; and in fact, he would stand a good chance of succeeding in his challenge and thereby barring his prosecution. *See Doggett*, 505 U.S. at 651-58 (finding a speedy trial violation in comparable circumstances). Article 7 incorporates precisely that result: if criminal prosecution would be barred due to the lapse of time in the United States, then Cruz Martinez's extradition must be refused. *See* 1978 Treaty, art. 7 (forbidding extradition where criminal prosecution "has become barred by lapse of time according to the laws of the requesting or *requested Party*.") (emphasis added).[2]

---

[2]The majority misapprehends this dissent's discussion of *Doggett*. Nowhere in this dissent is there any suggestion that *Doggett* sheds light on the meaning of "lapse of time." *Doggett* tells us two things. First, that extraditees can raise a speedy trial defense when the U.S. government has failed to timely pursue their extradition to the United States. The result should be no different in this case, where the roles of the two countries are simply reversed. Article 7 offers a defense against extradition if prosecution would be "barred by lapse of time *according to the laws* of the requesting *or* requested Party." The Treaty has a reciprocal effect: if criminal prosecution would be barred due to the lapse of time in the United States, then Cruz Martinez's extradition to Mexico must be refused. Second, the point of *Doggett* is to show that in some cases, there is a presumption of prejudice when the delay is significant (as it is here). As discussed on pages 16-17 of this dissent, *Doggett* is simply meant to illustrate that if Cruz Martinez was actually able to raise a speedy trial claim, he would probably prevail due to the similarities between his case and *Doggett* (where the delay of over eight years established a presumption of prejudice).

Additionally, Article 7 is designed to serve purposes other than facilitating the reciprocal extradition of criminals, as it limits extradition rather than enables it. The apparent "object and purpose" of the provision is to provide persons facing extradition the same degree of protection against stale prosecution that the laws of the United States or of Mexico would grant in a domestic criminal prosecution. *See Restatement*, § 325(1). The two countries may also quite reasonably have sought to incentivize the timely extradition and prosecution of criminals. *See Barker*, 407 U.S. at 520 (identifying "a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused."). Interpreting Article 7 to incorporate the Sixth Amendment's protection against untimely prosecution furthers these purposes and is consistent with the Treaty's protective purpose. At the very least, such an interpretation does not "effect[] a result inconsistent with the intent or expectations of its signatories." *Maximov*, 373 U.S. at 54.

Consequently, there is no reason to believe that the text of Article 7 gives rise to any ambiguity or doubt as to what the Treaty's drafters intended; there is no reason to question whether the drafters really meant what they wrote into the Treaty. Indeed, courts have long recognized that "treaties are the subject of careful consideration before they are entered into, and are drawn by persons competent to express their meaning, and to choose apt words in which to embody the purposes of the high contracting parties." *Rocca v. Thompson*, 223 U.S. 317, 332 (1912).

But even if the language of Article 7 could somehow be seen as ambiguous, the result would be the same. The majority misreads *Factor v. Laubenheimer*, 290 U.S. 276 (1933) as requiring a blanket presumption in favor of the rights of the signatory countries, and therefore in favor of extradition. But that is not what *Factor* stands for. What that case actually stands for is that strained or overly narrow treaty interpretations should be avoided. The Supreme Court specifically directed that "[i]n choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements," and, in the same vein, that "if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred." 290 U.S. at 293-

94. *Factor* therefore directs us to reject a "narrow and restricted construction" of Article 7, resolving any ambiguity in favor of a broader reading of the rights it grants to persons facing extradition.

Other cases relying on the same language favoring broad construction of rights granted by a treaty make clear that the rights accorded liberal construction under this presumption include rights granted to individuals rather than governments. *See Nielsen v. Johnson*, 279 U.S. 47, 52, 57-58 (1929) (adopting a broad construction of rights under a treaty to liberally construe a Danish citizen's right to be free from discriminatory taxes in the United States under a treaty between the United States and Denmark); *Jordan v. Tashiro*, 278 U.S. 123, 127-29 (1928) (adopting a broad construction of rights under a treaty to liberally construe the rights of Japanese Americans to engage in commerce under a treaty between the United States and Japan).

Despite what the majority says, *Factor* did not announce any broad default rule in favor of extradition when interpreting an extradition treaty. All the Supreme Court did in that case was apply existing principles of treaty interpretation—principles that in no way presume that the rights of foreign governments must always be given precedence over individual rights granted by a treaty. Applying a presumption in favor of extradition under Article 7 would be to distort the holding of *Factor* beyond recognition. If anything, we should honor *Factor*'s guidance by construing Article 7 liberally to affirm the rights which may be claimed under the Article— namely, the right to avoid extradition if criminal prosecution for the offense would be "barred by lapse of time according to the laws" of either country. 1978 Treaty, art. 7.

It is worth noting though that *Factor* is more than eighty years old, and hardly the only source of guidance as to how to interpret ambiguous treaty provisions. More recent cases tell us that we should look to historical evidence of the drafters' intent "to resolve ambiguities in the text." *Air France*, 470 U.S. at 400; *see also Medellín*, 552 U.S. at 506-07 (instructing that although "[t]he interpretation of a treaty . . . begins with its text," the Court also relies on historical materials as "aids to its interpretation" (internal quotation marks omitted)); *United States v. Stuart*, 489 U.S. 353, 366 (1989) ("Nontextual sources . . . often assist us in giving effect to the intent of the Treaty parties, such as a treaty's ratification history and its subsequent operation." (citation and quotation marks omitted)).

The limited history available supports the interpretation that Article 7 incorporates the Sixth Amendment's right to a speedy trial. First, Article 7 uses notably broader language than the corresponding provision in the United States' previous extradition treaty with Mexico. The prior treaty barred extradition in cases where criminal prosecution for the offense would be "barred by *limitation* according to the laws of the country to which the requisition is addressed." Extradition Treaty, U.S.-Mexico, art. III, Feb. 22, 1899, 31 Stat. 1818 (emphasis added). Had the drafters of the 1978 Treaty intended only to incorporate statutes of limitation, they could have easily used the same "barred by limitation" language to clearly limit the scope of protection.

Moreover, the U.S. negotiators were almost certainly aware that language incorporating defenses based on the "lapse of time" could be interpreted to include the Speedy Trial Clause. When the United States negotiated and entered into the 1978 Treaty with Mexico, the only published case in the United States addressing whether the Speedy Trial Clause was incorporated by "lapse of time" language in extradition treaties was *In re Extradition of Mylonas*, 187 F. Supp. 716 (N.D. Ala. 1960). That case found it a matter of common sense that defenses barring prosecution based on the "lapse of time" included the Speedy Trial Clause. *Id.* at 721.

The majority's response to *Mylonas*—or as the majority puts it, this "twice-buried decision"—is that "*Mylonas* was not on anyone's radar." Maj. Opn. at 23. But this is misleading and wrong. For one, it was not until some fifteen years *after* the United States negotiated and entered into the 1978 Treaty with Mexico that *Mylonas* was disavowed. *See Martin v. Warden*, 993 F.2d 824, 829 n.8 (11th Cir. 1993). In 1978, *Mylonas* not only remained good law, it was the only law on point. The *Mylonas* decision, at the very least, allows an inference that the drafters were aware of the possibility that Article 7 could be interpreted to include the Speedy Trial Clause. Indeed, the U.S. State Department was certainly aware of the potential scope of *Mylonas*, as evidenced by a June 22, 1960 letter from the State Department's Assistant Legal Advisor to a U.S. Attorney concerning the *Mylonas* decision. *See In re Extradition of Mackin*, 668 F.2d 122, 136 (2d Cir. 1981) (quoting from that letter).

At the time of the negotiations, *Mylonas* provided the most reliable guide for how the "barred by lapse of time" provision should apply to extradition cases. By replacing the 1978

Treaty's "barred by limitation" phrase with "barred by lapse of time," the drafters incorporated a broader set of rights into the new version. There is no other reason why the drafters would have chosen to replace the original "barred by limitation" language with the broader "barred by lapse of time" phrase—a phrase that describes an entire class of laws, not just statutes of limitation.

Again, even assuming the language of Article 7 were considered ambiguous, the only conclusion to be drawn from the historical evidence is that the drafters intended to incorporate the right to a speedy trial. At a minimum, the context of *Mylonas* and the departure from the more restrictive formulation of the previous treaty confirms that "application of the words of the treaty according to their obvious meaning"—*i.e.*, to incorporate the Sixth Amendment's right to a speedy trial—would not "effect[] a result inconsistent with the intent or expectations of its signatories." *Maximov*, 373 U.S. at 54. We should give effect to the "apt words" chosen by the drafters of the 1978 Treaty and hold that Cruz Martinez may raise a defense to extradition on the grounds that his prosecution has become barred due to lapse of time under the Speedy Trial Clause. *See Rocca*, 223 U.S. at 332.

## C.  *Cruz Martinez's Speedy Trial Claim*

What is particularly troubling about this case is that if Cruz Martinez was actually able to raise a speedy trial claim, he would probably prevail. To determine whether the lapse of time between accusation and trial constitutes a violation of the Sixth Amendment, courts balance "'whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result.'" *United States v. O'Dell*, 247 F.3d 655, 667 (6th Cir. 2001) (quoting *Doggett*, 505 U.S. at 651). If the government uses "reasonable diligence" in seeking to bring an accused to justice, a speedy trial claim will generally fail "as a matter of course however great the delay, so long as [the accused] could not show specific prejudice to his defense." *Doggett*, 505 U.S. at 656. "[O]fficial bad faith in causing delay will be weighed heavily against the government," resulting in dismissal if the delay is significant. *Id.* Where delay results from "official negligence in bringing an accused to trial," the need for the accused to show prejudice from the delay lessens with the length of time elapsed. *Id.*

The similarities between this case and *Doggett*—a case where the Supreme Court found a speedy trial violation in a delay of over eight years—bring this case within the limited parameters of a presumption of prejudice. Like Cruz Martinez, Doggett left the country without knowing he was being charged with a crime. 505 U.S. at 648-49. The United States declined to seek his extradition from Panama, despite knowing he was there, and instead asked Panama to "expel" Doggett to the United States. *Id.* at 649. Although the Panamanian authorities agreed to do so, they ultimately released Doggett and let him go to Colombia, where he lived with a relative. *Id.* Several months later, Doggett "passed unhindered through Customs in New York City and settled down in Virginia." *Id.*

Just like Cruz Martinez, Doggett lived openly under his own name in the United States for six years. *Id.* at 649-50. He was ultimately discovered "when the Marshal's Service ran a simple credit check on several thousand people subject to outstanding arrest warrants and, within minutes, found out where Doggett lived and worked." *Id.* at 650. Nearly six years after his return to the United States, Doggett was arrested. *Id.*

Beginning with its failure to request Doggett's extradition from Panama, and continuing through its failure to follow up on his whereabouts, the government had demonstrated, in the words of the Supreme Court, an "egregious persistence in failing to prosecute Doggett." *Id.* at 657. Indeed, "[f]or six years, the Government's investigators made no serious effort to test their progressively more questionable assumption that Doggett was living abroad." *Id.* at 652-53. Based on the length of the delay, the Court held that Doggett did not have to show how he was prejudiced:

> When the Government's negligence thus causes delay six times as long as that generally sufficient to trigger judicial review, and when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant's acquiescence, nor persuasively rebutted, the defendant is entitled to relief.

*Id.* at 658 (citations omitted).

The similarities between this case and *Doggett* are striking. More than six years elapsed between the alleged shooting on December 31, 2005 and Mexico's informal request for Cruz Martinez's extradition in May 2012. Another year and three months passed before Mexico

formalized its extradition request with the delivery of a complete packet in August 2013. And in all this time, Cruz Martinez, like Doggett, had no idea he was wanted by U.S. or Mexican authorities. Meanwhile, he lived openly in the United States under his own name and returned to Mexico multiple times—presumably "pass[ing] unhindered through Customs" each time. *Id.* at 649. At the very least, there is circumstantial evidence of negligence and unjustified failure to prosecute on the part of the Mexican government. These circumstances certainly raise a presumption of prejudice that might justify relief.

We do not, however, have the benefit of a district court decision making factual findings on these issues or analyzing the application of the Barker factors. Nor has the government been asked to present evidence that Mexico diligently sought Cruz Martinez during the period that he was living in the United States. That is why remand is necessary.

The majority suggests that it would be infeasible to conduct the fact-finding necessary to adjudicate Cruz Martinez's speedy trial claim. Yet, the administrative challenges are not nearly as grave as the majority would suggest. Application of the *Barker* factors in an extradition setting is not likely to result in a searching inquiry into the actions of foreign officials. In most cases, introduction of evidence that the requesting country pursued the suspect with "reasonable diligence" will end the inquiry, since under *Doggett*, a showing of diligence will nearly always defeat a speedy trial claim "however great the delay." 505 U.S. at 656. In other cases, where the accused is alleged to be a fugitive from justice, the speedy trial analysis will be comparable to the analysis already implemented by courts considering claims that the person's flight from justice tolled the statute of limitations. *See* 18 U.S.C. § 3290; *Jhirad v. Ferrandina*, 536 F.2d 478 (2d Cir. 1976).

The 1978 Treaty offers a ready mechanism, in the form of Article 12, for the United States to obtain the evidence necessary to make such a showing. That provision anticipates that there may be cases where the executive of the requested country "considers that the evidence furnished in support of the request for extradition is not sufficient to fulfill the requirements of [the] Treaty," and therefore allows the requested country to "request the presentation of the necessary evidence." 1978 Treaty, art. 12. This is not a discovery rule, but rather a diplomatic mechanism. There is therefore no risk that Mexico will be forced to offer up evidence of bad-

faith delay for review by a U.S. court.  Additionally, in light of the relaxed rules of evidence applicable in extradition hearings, proof of Mexico's diligence may be presented in any reasonably reliable form adequate to document the country's efforts in seeking Cruz Martinez.

Because all of this may be easily and properly accomplished well within the scope of the 1978 Treaty and the competence of U.S. magistrate judges,[3] concerns about the factual inquiry necessary for the *Barker* factors do not provide a reason for construing Article 7's lapse of time defense as excluding the right to a speedy trial.

### D.  The Majority Opinion

The majority makes a number of arguments in its attempt to evade the plain meaning of Article 7.  None of them are persuasive.  First, contrary to what the majority says, no word or turn of phrase in Article 7 suggests that its application is restricted to the commencement of criminal proceedings—in fact, the express inclusion of lapse of time protection against the "enforcement of the penalty" for an offense settles any doubt that the scope of Article 7 extends beyond the initiation of prosecution.  1978 Treaty, art. 7.  The majority mischaracterizes the Oaxacan statute of limitations as supporting its interpretation, glossing over the statutory language that specifically protects against undue delay during criminal proceedings.  Rather than dropping out of the picture at the commencement of the prosecution, the Oaxacan statute of limitations "reset[s] and shall begin anew[] at the time of the reading of the charges at arraignment."  (R. 2-19, Law of the State of Oaxaca, PageID# 378.)  This effectively secures to criminal defendants protection comparable to the Speedy Trial Clause under U.S. law.  Article 10(2), also cited by the majority, offers no guidance because it does not even mention the phrase "lapse of time," much less purport to define or limit it.  1978 Treaty, art. 10(2).

The majority then relies on a number of inapposite citations in support of its theory that Article 7's "lapse of time" language is most naturally read to refer only to a fixed statutory limitations period.  The difficulty is that, with the exception of *Yapp v. Reno*, 26 F.3d 1562 (11th Cir. 1994), and a handful of unpublished district court cases from California, none of the

---

[3]*See* 18 U.S.C. § 3184 (conferring authority upon magistrate judges to issue warrants and conduct extradition proceedings).

multitude of cases, treaties, or texts cited by the majority considers, much less rejects, the possibility that a clause incorporating "lapse of time" defenses in an extradition treaty may include constitutional speedy trial protections. Instead, most of these citations merely point to the use of the term "lapse of time" in some proximity to the statute of limitations. *See, e.g.,* Extradition Treaty, U.S.-Arg., art. 7, June 10, 1997, T.I.A.S. No. 12,866 (providing, in an article titled "Lapse of Time" that "[e]xtradition shall not be denied on the ground that the prosecution or the penalty would be barred under the statute of limitations in the Requested State."); Black's Law Dictionary 1321 (10th ed. 2014) (referring to the lapse of time in defining a period of prescription, but in no way equating the two as synonymous); *Canadian N. Ry. Co. v. Eggen*, 252 U.S. 553 (1920) (interpreting the term "lapse of time" to incorporate statutes of limitation in a civil maritime context).

These citations prove little, if anything. Comparison with other extradition treaties that make express reference to statutes of limitation in fact highlights the comparatively broad language employed in the U.S.-Mexico Treaty at issue today. Moreover, the extradition treaties with both Argentina and the Organization of Eastern Caribbean States, cited by the majority, mention the lapse of time and statutes of limitation in particular only to establish that a person facing extradition does *not* have recourse to those protections. *See* Extradition Treaty, U.S.-Arg., art. 7, June 10, 1997, T.I.A.S. No. 12,866; S. Treaty Doc. No. 105-13 (1997); Extradition Treaties, U.S.-O.E.C.S., art. 8, S. Treaty Doc. No. 105-19 (1997). The extradition treaty with France does contain language comparable to that with Mexico—but its specification about the treatment of acts of interruption emphasized by the majority does nothing to define or limit its incorporation of defenses to prosecution based on "lapse of time." *See* Extradition Treaty, U.S.-Fr., art. 9, Apr. 23, 1996, S. Treaty Doc. No. 105-13 (1997). Nor does the UN model treaty support the majority's unduly restricted reading of Article 7. The model treaty in fact recommends even broader language that would mandatorily bar extradition "[i]f the person whose extradition is requested has, under the law of either Party, become immune from prosecution or punishment *for any reason*, including lapse of time or amnesty." G.A. Res. 52/88, U.N. Model Treaty on Extradition, art. 3(e) (emphasis added).

Somewhere along the way, the majority has a "Eureka!" moment, pointing out that the Spanish version of the 1978 Treaty is titled "Prescripción." Maj. Opn. at 10. But how this matters to our analysis is completely beyond rationality. To the best of my knowledge, the writer for the majority does not speak or read Spanish. And since cutting and pasting the Spanish version's text into the less than authoritative *Google Translate* provides the same translations as those used by the majority, we may assume that the translations may have been taken from this questionable source. The majority's argument is less than persuasive when one realizes that its legal argument is predicated on a popularized and less than precise translation source. Language is complex and the meaning of a word can vary greatly depending on its context, as any native speaker can attest. It would seem that the majority is defining various phrases in a vacuum without considering the appropriate contexts in which they were used.

In any event, by making this argument, the majority reveals how result-oriented it is in its attempt to reach its own conclusions. Not only is the majority willing to look beyond the Treaty's text, and beyond our own drafters' intent as expressed in the text, the majority even purports to rely on the presumed intent of a foreign legislature—all while pretending to understand Spanish.

Moreover, whatever the phrase "lapse of time" means in Spanish is irrelevant. All that matters is that under our own legal system, "lapse of time" incorporates the speedy trial right. The answer to the question of whether Article 7 incorporates the Speedy Trial Clause has nothing to do with what the Spanish version of the 1978 Treaty says. By offering a defense against extradition if prosecution would be "barred by lapse of time *according to the laws of* the requesting *or* requested Party," Article 7 incorporates the body of relevant law of both countries. 1978 Treaty, art. 7 (emphasis added). Therefore, even if Mexico does not recognize the speedy trial right, the United States certainly does, and that is enough to raise a defense under Article 7 of the Treaty.

The majority's citing to *United States v. Percheman*, 32 U.S. (7 Pet.) 51, 8 L.Ed. 604 (1833) is totally meaningless inasmuch as that case is of little or no importance to the analysis. That case applies only when a court looks to another version of a treaty for interpretative clues, but there is no need to do so here. Certainly, there is no need to look to the Spanish version of

the 1978 Treaty because whether the drafters of the Spanish version thought the phrase "lapse of time" incorporates only statutory limitation periods is totally beside the point. The only relevant question is whether under our own legal system, "lapse of time" incorporates the speedy trial right, and the answer to that question is unequivocally "yes."

At the same time, the majority does not recognize the contradiction it falls into in making this argument. The majority argues that in some cases the litigants did not argue that a "lapse of time" provision incorporated the speedy trial right: "[n]ot one of the extraditees in these cases thought the speedy-trial point was worth their time." Maj. Opn. at 17. Their failure to do so, the majority colorfully argues, makes this "the case of the dog who didn't bark." *Id.* But the litigants in this case did not raise the "prescripción!" argument—this is something the majority came up with on its own. Under the majority's logic, then, the litigants in this case must not have thought the argument was worth their time—and consequently, neither should we.

More importantly, the fact that a particular argument was not made in a particular case offers no sound guidance, much less authority, for the question before us today; it is completely baffling why the majority thinks this is important. I do not know why the litigants in the cases cited by the majority did not make certain arguments—and neither does the majority. *See id.* at 16-17. But in any event, Cruz Martinez did "bark"; and the majority's canine metaphor is no solace to him, as he has been held in detention since June 21, 2013 and is now being extradited for a crime he allegedly committed *seven and a half years before* Mexico signaled its intent to prosecute him.

Similarly, the unpublished district court opinions cited by the majority are neither authoritative nor persuasive. Lacking direct authority on whether Article 7 incorporates the speedy trial right, each of these cases conflates the issue with precedent addressing whether there is an inherent right to a speedy extradition, or whether the speedy trial right is incorporated by generic "remedies and recourses" language. *See Gonzalez v. O'Keefe*, No. C 12-2681, 2014 WL 6065880, at *2-4 (N.D. Cal. Nov. 12, 2014); *In re Extradition of Flores Ortiz*, No. 10-MJ-2016-JMA, 2011 WL 3441618, at *5-6 (S.D. Cal. Feb. 9, 2011); *In re Extradition of Salazar*, No. 09MJ2545-BLM, 2010 WL 2925444, at *6 (S.D. Cal. July 23, 2010); *United States v. Garfias*,

No. CR-09-xr-90128, 2009 WL 2580641, at *2-3 (N.D. Cal. Aug. 20, 2009). These unpublished district court cases from California offer no more guidance than what a particular litigant did or did not argue in some prior case.

The sole appellate case on point, *Yapp v. Reno*, 26 F.3d 1562 (11th Cir. 1994), offers no more intellectually robust support for the majority's position. There, the Eleventh Circuit relied on the same definition-by-proximity method of reasoning as the majority to conclude that the phrase "lapse of time" referred primarily, and ultimately exclusively, to the statute of limitations. 26 F.3d at 1566. Both *Yapp* and the majority cite to a comment to *Restatement* § 476 that discusses the applicability of statutes of limitation under various formulations of "lapse of time" protections against extradition. *Id.* at 1567 (citing *Restatement* § 476, comment (e)). That comment, however, does not purport to restrict the term "lapse of time" to statutes of limitation. Significantly, the same *Restatement* elsewhere indicates that the phrase "lapse of time" may encompass other defenses, such as laches:

> *c. Lapse of time.* No general rule of international law limits the time within which a claim can be made. However, international tribunals have barred claims because of a delay in presentation to the respondent state *if the delay was due to the negligence or laches of the claimant state*.

*Restatement* § 902, comment (c) (emphasis added).

Of course, § 902 addresses interstate claims and remedies rather than extradition; nonetheless, it demonstrates that the phrase "lapse of time" may easily be used in connection with a broader set of claims and defenses than simply statutes of limitation.

Moreover, "lapse of time" is a phrase frequently used in American law in connection with any number of legal doctrines that operate based on the passage of time. For example, the term is frequently used with reference to laches and due process claims deriving from alleged unjustifiable delays. *See, e.g., King v. Alaska S.S. Co.*, 431 F.2d 994, 996 (9th Cir. 1970) ("[T]he right to bar an action for lapse of time is a substantive right. It is conceded that the relevant lapse of time standard in maritime law is the doctrine of laches." (citation omitted)); *Costello v. United States*, 365 U.S. 265, 281 (1961) ("In contending that lapse of time should be deemed to bar the Government from instituting this proceeding, the petitioner argues that the doctrine of laches

should be applied to denaturalization proceedings, and that in any event, the delay of 27 years . . . denied him due process of law in the circumstances of the case.").

In other circumstances, "lapse of time" is used in reference to rights that are claimed to have vested based on the passage of time. *See, e.g., Chase Secs. Corp. v. Donaldson*, 325 U.S. 304, 311-12 (1945) ("[W]here lapse of time has not invested a party with title to real or personal property, a state legislature, consistently with the Fourteenth Amendment, may repeal or extend a statute of limitations."); *Fed. Trade Comm'n v. Algoma Lumber Co.*, 291 U.S. 67, 79-80 (1934) (holding that misleading advertising was still actionable thirty years after initial use because "[t]here is no bar through lapse of time to a proceeding in the public interest to set an industry in order by removing the occasion for deception or mistake . . .").  Additionally, the concept of "lapse of time" is sometimes invoked in arguments about proper judicial procedure or the proofs required to meet an evidentiary standard. *See, e.g., Davis v. Adult Parole Auth.*, 610 F.2d 410, 414-15 (6th Cir. 1979) (discussing other courts' holding that "the lapse of time affects the quantum of required proof as well as the good faith and credibility of the moving party." (internal quotation marks omitted)); *Berkshire Land Co. v. Fed. Sec. Co.*, 199 F.2d 438, 441 (3d Cir. 1952) ("The presumption of payment arising from lapse of time does not work an extinguishment of the debt, nor, unlike the bar of the statute of limitations, does it require a new promise or its equivalent to revive it." (internal quotation marks omitted)).

Finally, and of course most relevant here, "lapse of time" is used in reference to constitutional speedy trial claims. *See, e.g., Doggett*, 505 U.S. at 658-69 (O'Connor, J., dissenting) ("The only harm to petitioner from the lapse of time was potential prejudice to his ability to defend his case."); *Robinson v. Whitley*, 2 F.3d 562, 569 (5th Cir. 1993) ("[A] defendant will not be heard to complain of a lapse of time attributable to continuances he sought and received from the trial court.  In such a situation, the speedy trial clock is properly tolled." (internal quotation marks omitted)); *United States v. Greene*, 737 F.2d 572, 575, n.3 (6th Cir. 1984) ("Greene makes no contention to this Court that the lapse of time from May 10, 1983 until August 22, 1983 when the initial trial began, or the time period from August 25, 1983 when a mistrial was declared, until October 24, 1983 when the second trial began, infringed upon his constitutional or statutory rights."); *United States v. Hauff*, 461 F.2d 1061, 1063 (7th Cir. 1972)

("With regard to the lapse of time between the accusation and the trial, the Speedy Trial Clause guarantees to a criminal defendant[] that the Government will move with the dispatch which is appropriate to assure him an early and proper disposition of the charges against him." (internal quotation marks omitted)); *Moser v. United States*, 381 F.2d 363, 364 (9th Cir. 1967) (holding that the defendants' speedy trial claim failed where they did not "assert, nor does anything in the trial record tend to show, that because of the lapse of time they were prejudiced in making their defense."); *see also Burns v. Lafler*, 328 F. Supp. 2d 711, 719 (E.D. Mich. 2004) ("To prosecute a defendant following an investigative delay does not deprive him of due process, even if his defense is somewhat prejudiced by the lapse of time.").

All of the above completely undermines the majority's suggestion that interpreting Article 7 to incorporate the Sixth Amendment's protection against untimely prosecution is a drastic deviation "from a consensus so settled." Maj. Opn. at 23. The issue can hardly be considered "so settled" with only one appellate decision directly on point (*Yapp v. Reno*), a decision that was wrongly decided for the reasons just stated.

The majority next asserts that the understanding of Article 7 set forth by this dissent would open the door for people like Cruz Martinez to argue that the "lapse of time" provision also incorporates the Speedy Trial Act. This, the majority says, "introduces a serious complication" because the Speedy Trial Act's provisions would be difficult to apply in extradition proceedings. Maj. Opn. at 25. But this concern is misplaced because Article 7, despite what the majority thinks, does not incorporate the statutory right. In contrast to the constitutional right, violations of the Speedy Trial Act do not "bar" a prosecution—*i.e.*, require that the charges be dismissed with prejudice. *See* 18 U.S.C. § 3162 (leaving the decision of whether to dismiss with prejudice to the discretion of the district court). The discretionary remedy provided by statute is inconsistent with the language of Article 7, which incorporates mandatory bars to prosecution. And even if the statute somehow did fall within Article 7, it contains an exclusion for "[a]ny period of delay resulting from the absence or unavailability of the defendant" that would render the seventy-day clock essentially irrelevant in extradition cases. 18 U.S.C. § 3161(h)(3)(A). The majority's alarmist concern is therefore completely without merit.

The majority also argues that comity requires a narrow interpretation of Article 7, but it fundamentally misunderstands the nature of the comity principles it cites. The majority suggests that we should be guided by the principle that U.S. courts must avoid "supervising the integrity of the judicial system of another sovereign nation." Maj. Opn. at 19 (quoting *Jhirad*, 536 F.2d at 484-85). This principle, known as the rule of non-inquiry, "'bars courts from evaluating the fairness and humaneness of another country's criminal justice system, requiring deference to the Executive Branch on such matters.'" *Hilton v. Kerry*, 754 F.3d 79, 84-85 (1st Cir. 2014) (quoting *Khouzam v. Att'y Gen. of U.S.*, 549 F.3d 235, 253 (3d Cir. 2008)).

This rule has a narrow scope and is typically cited only to bar inquiry into humanitarian concerns or a lack of procedural rights in a foreign criminal justice system. *See id.* at 83; *Khouzam*, 549 F.3d at 253; *Prasoprat v. Benov*, 421 F.3d 1009, 1016-17 (9th Cir. 2005); *Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir. 1990); *see also Glucksman v. Henkel*, 221 U.S. 508, 512 (1911) ("We are bound by the existence of an extradition treaty to assume that the trial will be fair.").

Although courts do not inquire into the fairness of criminal procedure or punishment under the laws of the country seeking extradition, it is clearly a court's role to determine whether extradition is permissible under the terms of the governing treaty. *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 8-9 (1936). Similarly, the executive's discretion to grant or deny extradition arises only after a person has been certified as extraditable under the governing treaty. *Hoxha v. Levi*, 465 F.3d 554, 564-65 (3d Cir. 2006). Nor, contrary to the majority's suggestion, is it in any way inappropriate in our constitutional system for courts to enforce individual rights granted by a treaty in the appropriate exercise of habeas jurisdiction. *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) ("[T]he Great Writ of habeas corpus allows the Judicial Branch to play a necessary role in maintaining th[e] delicate balance of governance, serving as an important judicial check on the Executive's discretion in the realm of detentions.").

Nowhere in this dissent is there any consideration or discussion of whether Cruz Martinez would face unfair treatment in Mexico. Cruz Martinez does not even make that argument. Rather, he is claiming that his extradition is barred under the terms of the governing

treaty.  The comity rule simply does not apply here, where both countries have willingly entered into a treaty granting and preserving the right which Cruz Martinez seeks to enforce.

III.

The majority's premise—that the phrase "lapse of time" refers only to a fixed statutory limitations period—is not supported by any of the multitude of cases, treaties, or texts it cites. The majority points to no authority of any kind that associates this distinctive language with, much less restricts it to, statutes of limitation.  "Lapse of time" is a phrase frequently used in connection with any number of legal doctrines that operate based on the passage of time— including speedy trial rights.  These uses are too numerous and varied to permit the conclusion that the term "lapse of time" is so strongly or so inherently associated exclusively with statutes of limitation that the treaty's drafters relied on it as a term of art to refer solely to statutes of limitation.  Instead, the frequent use of the phrase in connection with constitutional speedy trial claims confirms that a literal reading of the text of Article 7 incorporates the Speedy Trial Clause.

For these reasons, this case should be remanded for the district court to determine whether Cruz Martinez's Speedy Trial Clause rights were violated.

_____

**DISSENT**

_____

BERNICE BOUIE DONALD, Circuit Judge, dissenting. The treaty's text is ambiguous. The English version's "lapse of time" language is broad enough to include the Sixth Amendment's speedy trial guarantee as Judge White's concurrence and Judge Clay's dissent ably demonstrate. However, the Spanish version's use of "prescripción" is narrow enough to exclude the Sixth Amendment's speedy trial guarantee as the majority's erudite opinion makes clear. Since the treaty appears to say one thing in English and another in Spanish, we cannot resolve this case through a plain-meaning textual analysis. That said, I agree with Judge Clay that history and policy considerations support reading the Sixth Amendment's speedy trial clause into the treaty.